**FLEMING, Administrator of the Wage and Hour Division, United States Department of Labor, v. A. B. KIRSCHBAUM CO.**

No. 798.

District Court, E. D. Pennsylvania.

April 2, 1941.

Ernest N. Votaw, of Philadelphia, Pa., Abner Brodie, of Newark, N. J., and Edward J. Fruchtman, of Washington, D. C., for plaintiff.

Sidney L. Krauss, Wm. Clarke Mason, Frederick H. Knight, and Martin P. Snyder, all of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is an action under the Fair Labor Standards Act (Sec. 17) to enjoin certain violations of Secs. 6 and 7, 29 U.S.C.A. §§ 217, 206, 207. The defendant concedes that, as to certain of its employees, it has not complied with the requirements of these sections.

■ The constitutionality of the act having been established by the Supreme Court in United States v. Darby, February 3, 1941, 61 S.Ct. 451, 461, 85 L.Ed. —, the only question to be decided is whether it is applicable to this defendant.

The defendant is the owner of a six-story loft building in Philadelphia, portions of which it leases to manufacturing concerns, mostly in the clothing business. The tenants are engaged in interstate commerce, but the defendant has no interest in the business of any of its tenants.

As part of the consideration for the rent, the defendant furnishes the services of three elevator operators, two watchmen, three firemen, an engineer, a carpenter and a carpenter's helper, and a porter or cleaner, all of whom are employed and paid by it. It also employs a cashier and bookkeeper who are not involved in this proceeding. The elevator operators carry both passengers and freight in varying ratios between the several floors of the building. The watchmen pass through the building, closing windows, putting out lights, guarding against fires, etc. The engineer supervises the operation of the boilers, which produce steam used by some of the tenants in their manufacturing operations, the various pumps in the building, and the production of direct electric current which is used to light the building and is also used by two of the tenants; he also keeps the elevators in proper working order and takes care of the sprinkler tank. The firemen fire the boilers and occasionally supervise the running of the pumps when the engineer is called to another part of the building. The carpenter replaces sash chains, repairs the doors of the building and paints the common hallway, staircases, etc.

In general it may be said that the defendant through the above listed employees, heats the building, keeps it in repair, furnishes steam and direct electric current to those of its tenants who desire it, cleans those portions of the building which are not leased, and provides means of ingress and egress for its tenants, their employees, and for property being shipped to and by them. The defendant has no business, activities, or source of revenue other than those which are connected with its ownership and leasing of the building.

In United States v. Darby, the Supreme Court stated the objectives of the act. "As we have said the evils aimed at by the Act are the spread of substandard labor conditions through the use of the facilities of interstate commerce for competition by the goods so produced with those produced under the prescribed or better labor conditions; and the consequent dislocation of the commerce itself caused by the impairment or destruction of local businesses by competition made effective through interstate commerce." This epitomizes the declaration of policy contained in Sec. 2.

■ It is within the constitutional power of Congress to protect commerce against such dislocation. Specifically, Congress may exercise this power, either by excluding from interstate transportation goods produced under substandard conditions or by suppressing production of such goods, or by doing both. The second method of implementing its power is sustainable independently of the first. All this is expressly ruled in the opinion of the court.

The boundaries within which Congress may exercise its power to suppress production of condemned goods have not been precisely fixed by the Supreme Court. Congress itself has asserted the extent to which it proposes to exercise this power, by declaring in Sec. 3(j) of the Act that an "employee shall be deemed to have been engaged in the production of goods if such employee was employed * * * in any * * * occupation necessary to

the production thereof." Congress may exercise any of its powers to their full extent. Production is a term hardly easier to define precisely than commerce, but, granted the power to regulate or wholly suppress production for the purposes of the act, I do not think that Congress transgressed constitutional limitations in undertaking to deal with certain marginal activities so closely related with production that without regulating them there cannot be a plenary exercise of the power. This relationship is expressed in the phrase, "necessary to the production."

■■■ The activities of the employees involved in this case are, in my judgment, necessary to the production of the goods intended for interstate commerce manufactured by the tenants of the building, and I so find. The definition of "necessary" given by Chief Justice Marshall is fairly applicable. "To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable." McCulloch v. Maryland, 4 Wheat. 316, 413, 4 L.Ed. 579. The employees involved here can not be excluded from the operation of the act unless the word necessary is interpreted to mean indispensible. So to do would be to deny a liberal construction to a remedial act, contrary to the fundamental canon for the interpretation of statutes. See Wood v. Central Sand & Gravel Co., D.C., 33 F.Supp. 40. Since the Darby case and its express disavowal of so much of Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, as is inconsistent with it, I find no basis for the defendant's interpretation which in effect would limit the employees subject to the act to those who work upon or have physical contact with the article which will later move into commerce.

The argument is made that the word "employer" appearing in Sec. 6 and Sec. 7 must be construed to mean an employer who is a member of an "interstate industry," that only such employers are required to pay minimum wages and otherwise conform to the act, and that an employee engaged in an occupation necessary for the production of goods for interstate commerce is not covered by the act unless the whole industry of which his employer is a member can fairly be said to be an industry engaged in interstate commerce or in the production of goods for such commerce.

It may be conceded that renting buildings—the industry in which this employer is engaged—is not an industry "engaged in commerce or in the production of goods for commerce," and that Secs. 5 and 8, providing for industry committees and wage orders, cannot be applied to it. It does not follow, however, that Sec. 6 and Sec. 7, merely because they provide that the progressive increases in the minimum standards ordained to occur at definite future times may be accelerated in some, but not all, industries by administrative orders, must be limited by construction to only those industries as to which such orders can be made.

■■■ Another argument is based upon the legislative history of the act. It turns upon the fact that bills were passed both by the Senate and the House, and subsequently changed by a conference report, which was adopted in both Houses, and which contained the text of the law as passed. It is a fact, as stated in the conference report, that the House Bill affected only employers who were members of an industry engaged in interstate commerce, and so the character of the industry, as a whole, of which the employer was a member was made the first test of the applicability of the act to any employee. This limitation was eliminated by the conference report. The bills as passed in Sec. 6 and Sec. 7 say "every employer," and "no employer." The defendant argues that the Senate bill by its statement of policy impliedly contained the same limitations as the House bill, and that, since both bills had contained the limitation, there being no disagreement upon this point, the fact that the bill reported from conference did not contain it is no indication of an intention to abandon it, but the contrary. But I do not think that the Senate bill can be read as containing the limitation, and the conclusion which I draw from the legislative history of the act is that in its final enactment it was intended to cover all employers with the exception of those specially exempted by Sec. 13, regardless of the general characteristics of their industry. It is thus the nature of the employee's occupation which determines whether or not the employer is, so far as the employee is concerned, subject to the Fair Labor Stand-

ards Act. Sunshine Mining Co. v. Carver, D.C., 34 F.Supp. 274.

The remaining question is whether the defendant here comes within the specific exemption of Sec. 13(a) (2) as a "service establishment." There is a further limitation that if so, the greater part of such servicing must be in intrastate commerce, but unless the employer can be classified as a service establishment, this second requirement is unimportant. Unquestionably, most if not all of the work done by the employees in this case could be properly described as servicing. But the defendant's business is primarily leasing a building for manufacturing purposes. It sells or rents space. In order to promote its business it offers certain services to be rendered by some of its employees. The test, however, must be the primary business of the employer, not the particular occupation of the employee, for the exemption relates to employers only. It has been held that a business of this kind is a "manufacturing establishment". Barfoot v. White Star Line, 170 Mich. 349, 136 N.W. 437. It is not necessary, however, to go so far. Nor is it necessary to hold as the Government contends, that a service establishment within the meaning of the act is one which possesses essentially the same characteristics as a retail establishment. However the defendant's business may be classified, it is not in my opinion a service establishment.

Judgment for the plaintiff in accordance with the prayer of the complaint.