**MURPHY v. GEORGIA AERO–TECH.**
No. Civil 214.

District Court, S. D. Georgia, Augusta
Division.
May 5, 1943.

Henry T. Chance, Roy V. Harris, and Isaac S. Peebles, Jr., all of Augusta, Ga., for plaintiffs.

Hull, Barrett, Willingham & Towill and J. J. Willingham, all of Augusta, Ga., and Emil N. Levin, of Chicago, Ill., for defendants.

LOVETT, District Judge.

This is another of many cases brought in this court calling for the "drawing of lines" in determining the scope of the Fair Labor Standards Act. 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.

The suit is under section 16(b) by and in behalf of thirty-six former employees of the defendants for unpaid wages claimed to be owing to them under the Act.

Only one question now demands attention[1]; whether the act applies to the plaintiffs. And the precise question may be reduced even more narrowly, viz., were the plaintiffs engaged in commerce within the meaning of sections 6 and 7 of the Act.[2]

The defendants conduct a school for the training of student air pilots, all of whom are enlisted men of the United States Army with the status of cadets. The students pay nothing for their training. The operations are carried on under a contract with the government, which pays for the service. The defendants lease certain lands near Augusta, Georgia, adjacent to the Savannah River dividing the states of Georgia and South Carolina, lying wholly in Georgia, and used as an airfield. All equipment, airplanes, engines, etc., are owned by the United States and, under the contract, are loaned to the school. Barracks, mess hall, hangars and similar buildings are located on the premises, and the students live there and are furnished their meals by the school. The personal property used in furnishing such service to the students, i. e., beds, bedding, dishes, cooking utensils, canteen and office equipment, tools, and like personal property are owned by the defendants. The school services the equipment loaned by the government and makes minor repairs to it. Major repairs are made elsewhere and by the government. The army maintains its own officer personnel at the school and the students are at all times subject to their orders and discipline. The school supplies the instructors for the students.

Most of the plaintiffs did either construction or maintenance work on the airfield, three were janitors, three mess hall attendants, one a night watchman and one a general unskilled laborer, doing whatever work was assigned to him. None was an instructor; none had anything to do with the operations of the planes in the air; none moved any goods in commerce. No goods were produced for commerce by the school or its employees. The period of employment now in controversy was May 25, 1941, to July 31, 1942.

Students flying planes occasionally and fortuitously crossed the river in the air, and flew over some parts of South Carolina. A flight commander, well qualified to know, estimated that this occurred not more than 3% of the students' flying time. Even that was contrary to instructions of the school. There was no flying terminus in South Carolina or any state other than Georgia.[3] If landings took place in South Carolina it was only because of an emergency. In more than a year ten occurred—some being crash landings. What is known as a "flight pattern" in the air for the school was established by army regulations. Within it students fly to an altitude of 700 feet. A special area of flight is also set apart for the

---

[1] Trial by jury has been waived, evidence has been heard, and the case submitted to the court as trior of the facts.

[2] There is no claim that any goods were produced for commerce by the defendants.

[3] For perhaps five months prior to August, 1942, cross-country flights were made at intervals to Anderson, South Carolina, requiring about 80 minutes for the round trip. They were discontinued when the air-field at Anderson had to be repaired. One trip was made by air to a point in Alabama. All other cross country flights were to auxiliary fields in Burke county, Georgia, regularly maintained for the purpose. Flights to these fields did not require crossing into South Carolina.

school under the Civil Aeronautic Authority, from which civilian and army planes (except those used by the school) are excluded. This pattern and area lie wholly above the State of Georgia.

The school transports by truck—not, however, operated by any of the plaintiffs—goods and merchandise received by rail or other carrier in Augusta, Georgia, for use at the school. Some of these goods move in interstate commerce; some are the property of the school, some of the United States Army. These goods consist chiefly of foodstuffs consumed by the cadets, water bottles, army material and, in one instance, used parachutes being returned for repairs. In the routine operation of the school, when occasion requires, the defendants make the customary use of telephone, telegraph and postal facilities for communicating with others within and without the state on matters of business.

■ The application of the act turns upon the activities of the employees. Kirschbaum v. Walling, 316 U.S. 517, 524, 62 S.Ct. 1116, 86 L.Ed. 1638; Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 90, 63 S.Ct. 125, 87 L.Ed. ——. The burden here is is on the plaintiffs to prove that in the services they render for their employers, and without regard to the nature of the employer's business, they were engaged in commerce within the meaning of the act. Commerce is defined by the act[4] to mean "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof". I think they have failed to carry that burden.

They transport, transmit and communicate nothing. They handle no trade or commerce in the commonly accepted sense of the words. Their work is on the ground.

It is purely local, i. e., constructing and maintaining the airfield, keeping the buildings clean and sanitary, serving the cadets their meals, etc. We do not have here a case, like the Kirshbaum and Warren-Bradshaw cases, supra, where employees render service to one producing goods for commerce, though not employed by the producer, and where it becomes proper to inquire into the relationship of the particular employee to the production of the goods and to determine if his activity is necessary to such production. In these cases the expansive language of Section 3(j) is brought into play. Here we are concerned only with the activities of the employees in their assigned work.

■ Nor is this a case where the employees are vital to the proper functioning of instrumentalities of interstate commerce,[5] thereby necessarily making their work in practice and legal contemplation a part of it, unless it can be said that airplanes for students who seek training for army service in the air are in and of themselves such instrumentalities or media of commerce. And I believe they are not. The casual or chance flying into another state, or even regular and continuous flight out of the state where the training is undertaken, does not per se make them such. A boomerang or a carrier pigeon released near a state line and returning whence it came without descending does not become an instrument of commerce because, forsooth, in flight it passes across the line. And this remains so though the person releasing the missile or the messenger is teaching others how to use them, and for pay. Of course commerce comprehends more than transportation, trade or traffic. Intercourse may in some circumstances constitute interstate commerce.[6] The art of instruction, how-

---

[4] § 3(b), 52 Stat. 1060, 29 U.S.C.A. § 203. "Produced" for commerce has a broader statutory definition, but we are not here concerned with goods produced for such commerce. Section 3(j).

[5] Cf. Pedersen v. Delaware, L. & W. R. Co., 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125, Ann.Cas.1914C, 153 (an employee carrying bolts to repair a bridge over which interstate trains passed held engaged in interstate commerce within the meaning of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.); Overstreet v. North Shore Corp., Feb. 1, 1943, 317 U.S. 606, 63 S.Ct. 494, 87 L. Ed. ——, (where operating and mainte-

nance employees of one owning a toll bridge and drawbridge together constituting a medium of interstate commerce were held under the coverage of the Fair Labor Standards Act).

[6] Correspondence schools, involving regular, continuous intercourse by mail between the school in one state and the student in another is an example. International Text-Book Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A.,N.S., 493, 18 Ann.Cas. 1103. Transmission of information by telegraph between two states, or from one point to another in the same state, but passing through another state, in accordance with

ever, where student and teacher meet face to face, generally is not looked upon as involving commercial intercourse. If it were, then all schools and colleges who solicit students by advertisement or mail beyond the states where they are located would be engaged in interstate commerce, and the very books they use would become instrumentalities of such commerce.[7]

But it is urged that the school takes on an interstate complexion because it purchases foodstuffs in other states and has them shipped to the airfield where the students consume them. All phases of a business selling intrastate are not covered by the Fair Labor Standards Act solely because it makes its purchases interstate. Walling v. Jacksonville Paper Co., 317 U. S. 564, 63 S.Ct. 332, 87 L.Ed. ——, and Higgins v. Carr, Bros. Co., 317 U.S. 572, 63 S. Ct. 337, 87 L.Ed. ——, decided January 18, 1943. When the goods bought without the state were unloaded at the school (and later there consumed) the interstate movement ended. None of the plaintiffs is shown to have rendered any service related to the transportation or delivery of such goods, and for that reason alone they can not claim the movement of these goods affected their activities.

If we look to the declared purposes of the

legislation we find in practical application it is not needed here. This school operates under and pursuant to a contract with the United States. Substandard labor conditions are easily preventible by the simple insertion of a clause in the contract fixing named hours, wages, overtime compensation, etc., to be observed. In contracts of similar import this is not unusual. The Walsh-Healy Act[8] and the Davis-Bacon Act[9], in certain public contracts, require such agreements to be made.

Finally, the defendants say they are a service establishment within the exemption of Section 13(a) (2) of the Act. I can not agree. The service establishment contemplated by the section is one that, somewhat like a retail store, serves customers indiscriminately as a business and performs work or labor on the person or the property of the customer or serves his physical needs or desires—not one that hires itself out to the United States to train a specially selected group in the highly specialized art of aviation.[10] The service establishment Congress had in mind where unwholesome labor conditions might exist was something much more menial and subject to much less control.

Judgment will be for the defendants.

habitual practice, is another. Western Union Tel. Co. v. Speight, 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104.

[7] Judge Atwell of the Northern District of Texas reached the conclusion that a similar school was not engaged in interstate commerce within the meaning of the Fair Labor Standards Act in the unreported case of Smith v. Dallas Aviation School, No. 653, decided May 25, 1942. There is also before the court here a lengthy legal opinion given on May 16, 1942 to the Air Judge Advocate by Lt. Col. Croghan, Chief, Contracts Section Air Corps, to the same effect, with which the Colonel has stated the Department of Labor by letter of April 1, 1942, substantially concurred. This opinion and statement were received as contemporaneous construction by the men charged with the enforcement of the statute, which, while not controlling, is entitled to some weight by the courts, particularly where if the interpretation by the governing authorities had been different the contracting parties might have made a different engagement with the government. United

States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. See also as to effect of purely legal interpretation by legal staff of a department, Fleming v. A. H. Belo Corp., 5 Cir., 121 F.2d 207 (5, 6), 212–214.

[8] 49 Stat. 2036, 56 Stat. 277, 41 U.S. C.A. § 35.

[9] 46 Stat. 1494, 49 Stat. 1011, 54 Stat. 399, 40 U.S.C.A. § 276a.

[10] See Wood v. Central Sand & Gravel Co., D.C., 33 F.Supp. 40, 47; Fleming v. A. B. Kirschbaum, 38 F.Supp. 204; Id., 3 Cir., 124 F.2d 567; Id., 316 U.S. 517, at page 526, 62 S.Ct. 1116, 86 L.Ed. 1638; Stucker v. Roselle, D.C., 37 F. Supp. 864, 867; Muldowney v. Seaberg Elevator Co., D.C., 39 F.Supp. 275; Fleming v. Kenton Loose Leaf Tobacco Warehouse Co., D.C., 41 F.Supp. 255(3), 256, 257; Snavely v. Shugart, D.C., 45 F. Supp. 722; Lorenzetti v. American Trust Co., D.C., 45 F.Supp. 128; Consolidated Timber Co. v. Womack, 9 Cir., 132 F.2d 101, 102, 106, 107.