## A. B. KIRSCHBAUM CO. *v.* WALLING, ADMINIS-TRATOR OF THE WAGE & HOUR DIVISION, U. S. DEPARTMENT OF LABOR.*

No. 910. Argued April 28, 29, 1942.—Decided June 1, 1942.

*Mr. William Clarke Mason,* with whom *Mr. Frederick H. Knight* was on the brief, for petitioner in No. 910. *Mr. Walter Gordon Merritt,* with whom *Messrs. Kenneth C. Newman, Henry Clifton, Jr.,* and *Robert R. Bruce* were on the brief, for petitioners in No. 924.

*Solicitor General Fahy,* with whom *Messrs. Richard H. Demuth, Warner W. Gardner, Irving J. Levy, Mortimer*

---

*Together with No. 924, *Arsenal Building Corp. et al.* v. *Walling, Administrator of the Wage & Hour Division, U. S. Department of Labor,* on writ of certiorari, 315 U. S. 792, to the Circuit Court of Appeals for the Second Circuit.—Argued April 29, 1942.

518

 

*B. Wolf,* and *Norman S. Altman* were on the briefs, for respondent. *Mr. Abner Brodie* was also on the brief for respondent in No. 910.

Mr. Justice Frankfurter delivered the opinion of the Court.

In *United States* v. *Darby,* 312 U. S. 100, and *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, the constitutionality of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U. S. C. § 201 *et seq.,* was sustained. In the cases now before us we are required to consider the scope of the Act in relation to a particular phase of industrial activity. Specifically, the problem is this: Under § 6 of the Act an employer must pay prescribed minimum wages "to each of his employees who is engaged in commerce or in the production of goods for commerce," and under § 7 overtime compensation must be given "any of his employees who is engaged in commerce or in the production of goods for commerce." Section 3 (j) provides that "for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed . . . in any process or occupation necessary to the production thereof, in any State." The employees here are engaged in the operation and maintenance of a loft building in which large quantities of goods for interstate commerce are produced. Does the Fair Labor Standards Act extend to such employees?

The facts in the two cases differ only in minor detail. In No. 910, the petitioner owns and operates a six-story loft building in Philadelphia. The tenants are, for the most part, manufacturers of men's and boys' clothing. In No. 924, the petitioners own and operate a twenty-two story building located in the heart of the New York City clothing manufacturing district. Practically all of the

tenants manufacture or buy and sell ladies' garments. Concededly, in both cases the tenants of the buildings are principally engaged in the production of goods for interstate commerce. In No. 910, the petitioner employs an engineer, three firemen, three elevator operators, two watchmen, a porter, a carpenter, and a carpenter's helper. In No. 924, the controversy involves two firemen, an electrician, fourteen elevator operators, two watchmen, and six porters. These employees perform the customary duties of persons charged with the effective maintenance of a loft building. The engineer and the firemen produce heat, hot water, and steam necessary to the manufacturing operations. They keep elevators, radiators, and fire sprinkler systems in repair. The electrician maintains the system which furnishes the tenants with light and power. The elevator operators run both the freight elevators which start and finish the interstate journeys of goods going from and coming to the tenants, and the passenger elevators which carry employees, customers, salesmen, and visitors. The watchmen protect the buildings from fire and theft. The carpenters repair the halls and stairways and other parts of the buildings commonly used by the tenants. The porters keep the buildings clean and habitable.

Deeming these employees within the Act because of their relationship to the activities of the tenants, the Administrator brought suits to enjoin the petitioners from violating the Act by paying wages at lower rates than those fixed by the Act. In No. 910, the District Court granted an injunction, 38 F. Supp. 204, and the Circuit Court of Appeals for the Third Circuit affirmed. 124 F. 2d 567. In No. 924, the District Court denied an injunction, 38 F. Supp. 207, but the Circuit Court of Appeals for the Second Circuit reversed. 125 F. 2d 278. Despite

this concurrence of views of the two Circuit Courts of Appeals,[1] we brought the cases here because of the important questions presented as to the scope of the Fair Labor Standards Act. 315 U. S. 792.

To search for a dependable touchstone by which to determine whether employees are "engaged in commerce or in the production of goods for commerce" is as rewarding as an attempt to square the circle. The judicial task in marking out the extent to which Congress has exercised its constitutional power over commerce is not that of devising an abstract formula. Perhaps in no domain of public law are general propositions less helpful and indeed more mischievous than where boundaries must be drawn, under a federal enactment, between what it has taken over for administration by the central Government and what it has left to the States. To a considerable extent the task is one of accommodation as between assertions of new federal authority and historic functions of the individual States. The expansion of our industrial economy has inevitably been reflected in the extension of federal authority over economic enterprise and its absorption of authority previously possessed by the States. Federal legislation of this character cannot therefore be construed without regard to the implications of our dual system of government.

The body of Congressional enactments regulating commerce reveals a process of legislation which is strikingly empiric. The degree of accommodation made by Congress from time to time in the relations between federal and state governments has varied with the subject mat-

---

[1] Compare *Warren-Bradshaw Drilling Co.* v. *Hall,* 124 F. 2d 42; *Killingbeck* v. *Garment Center Capitol, Inc.,* 259 App. Div. (N. Y.) 691, 20 N. Y. S. 2d 521; *Robinson* v. *Massachusetts Mut. Life Ins. Co.,* 158 S. W. 2d 441 (Tenn.); *Cecil* v. *Gradison,* 40 N. E. 2d 958 (Ohio App.); *Pedersen* v. *Fitzgerald Construction Co.,* 262 App. Div. (N. Y.) 665, 30 N. Y. S. 2d 989.

ter of the legislation, the history behind the particular field of regulation, the specific terms in which the new regulatory legislation has been cast, and the procedures established for its administration. See, *e.g., Virginian Ry. Co.* v. *Federation*, 300 U. S. 515. Thus, while a phase of industrial enterprise may be subject to control under the National Labor Relations Act, a different phase of the same enterprise may not come within the "commerce" protected by the Sherman Law. Compare, for example, *United Leather Workers* v. *Herkert*, 265 U. S. 457, and *Levering & Garrigues Co.* v. *Morrin*, 289 U. S. 103, with *Labor Board* v. *Friedman-Harry Marks Clothing Co.*, 301 U. S. 58, and *Labor Board* v. *Fainblatt*, 306 U. S. 601. Similarly, enterprises subject to federal industrial regulation may nevertheless be taxed by the States without putting an unconstitutional burden on interstate commerce. Compare *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245, and *Oliver Iron Co.* v. *Lord*, 262 U. S. 172, with *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381.

We cannot, therefore, indulge in the loose assumption that, when Congress adopts a new scheme for federal industrial regulation, it thereby deals with all situations falling within the general mischief which gave rise to the legislation. Such an assumption might be valid where remedy of the mischief is the concern of only a single unitary government. It cannot be accepted where the practicalities of federalism—or, more precisely, the underlying assumptions of our dual form of government and the consequent presuppositions of legislative draftsmanship which are expressive of our history and habits—cut across what might otherwise be the implied range of the legislation. Congress may choose, as it has chosen frequently in the past, to regulate only part of what it constitutionally can regulate, leaving to the States activities which, if isolated, are only local. One need refer only to the history of Congressional control over the rates of intrastate carriers

which affect interstate commerce,[2] and the amendment of August 11, 1939, to the Federal Employers' Liability Act, extending the scope of that Act to employees who "shall, in any way directly or closely and substantially, affect" interstate commerce, 53 Stat. 1404. Compare *Federal Trade Commission* v. *Bunte Bros.*, 312 U. S. 349. The history of Congressional legislation regulating not only interstate commerce as such but also activities intertwined with it, justifies the generalization that, when the Federal Government takes over such local radiations in the vast network of our national economic enterprise and thereby radically readjusts the balance of state and national authority, those charged with the duty of legislating are reasonably explicit and do not entrust its attainment to that retrospective expansion of meaning which properly deserves the stigma of judicial legislation.

The Administrator does not contend that the employees in the cases before us are within the Act because Congress could have placed them there. The history of the legislation leaves no doubt that Congress chose not to enter areas which it might have occupied. As passed by the House, the bill applied to employers "engaged in commerce in any industry affecting commerce." See H. Rep. No. 2182, 75th Cong., 3rd Sess., p. 2; 83 Cong. Rec. 7749–50. But the bill recommended by the conference applied only to employees "engaged in commerce or in the production of goods for commerce." H. Rep. No. 2738, 75th Cong., 3rd Sess., pp. 29–30; 83 Cong. Rec. 9158, 9266–67. Moreover, in one of

---

[2] For the gradual development of this extension of federal authority, see *Shepard* v. *Northern Pacific Ry. Co.*, 184 F. 765, reversed *sub nom. Minnesota Rate Cases*, 230 U. S. 352; *Houston, E. & W. T. Ry. Co.* v. *United States*, 234 U. S. 342, as applied in *Illinois Central R. Co.* v. *Public Utilities Comm'n*, 245 U. S. 493, and as confirmed by § 416 of the Transportation Act of 1920, 41 Stat. 456, 484, and as extended by § 13 (4) of the Interstate Commerce Act, *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563.

its intermediate stages, the measure incorporated the *Shreveport* doctrine, *Houston, E. & W. T. Ry. Co.* v. *United States, supra,* in that it was specifically made applicable to intrastate production which competed with goods produced in another State. S. 2475, 75th Cong. 3rd Sess., as recommitted December 17, 1937, § 8(a). But, as reported by the House Committee on Labor, this provision was deleted. S. 2475, *supra,* as reported April 21, 1938; see H. Rep. 2182, *supra.*

Since the scope of the Act is not coextensive with the limits of the power of Congress over commerce, the question remains whether these employees fall within the statutory definition of employees "engaged in commerce or in the production of goods for commerce," construed as the provision must be in the context of the history of federal absorption of governmental authority over industrial enterprise. In this task of construction, we are without the aid afforded by a preliminary administrative process for determining whether the particular situation is within the regulated area. Unlike the Interstate Commerce Act and the National Labor Relations Act and other legislation, the Fair Labor Standards Act puts upon the courts the independent responsibility of applying *ad hoc* the general terms of the statute to an infinite variety of complicated industrial situations. Our problem is, of course, one of drawing lines. But it is not at all a problem in mensuration. There are no fixed points, though lines are to be drawn. The real question is how the lines are to be drawn —what are the relevant considerations in placing the line here rather than there. To that end we have tried to state with candor the larger considerations of national policy, legislative history, and administrative practicalities that underlie the variations in the terms of Congressional commercial regulatory measures and which therefore should govern their judicial construction.

We start with the weighty opinions of the two Circuit Courts of Appeals that the employees here are within the Act because they were engaged in occupations "necessary to the production" of goods for commerce by the tenants. Without light and heat and power the tenants could not engage, as they do, in the production of goods for interstate commerce. The maintenance of a safe, habitable building is indispensable to that activity. The normal and spontaneous meaning of the language by which Congress defined in § 3(j) the class of persons within the benefits of the Act, to wit, employees engaged "in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof," encompasses these employees, in view of their relation to the conceded production of goods for commerce by the tenants. The petitioners assert, however, that the building industry of which they are part is purely local in nature and that the Act does not apply where the employer is not himself engaged in an industry partaking of interstate commerce. But the provisions of the Act expressly make its application dependent upon the character of the employees' activities. And, in any event, to the extent that his employees are "engaged in commerce or in the production of goods for commerce," the employer is himself so engaged.[3] Nor can we find in the Act, as do the petitioners, any requirement that employees must themselves participate in the physical process of the making of the goods before they can be regarded as engaged in their production. Such a construction erases the final clause of § 3(j) which includes employees engaged "in any process or occu-

---

[3] The exact scope of the provisions of the Act dealing with the composition, authority, and procedure of advisory committees is not now before us. But, in any event, we do not find in them any limitation upon the area of regulation outlined by §§ 6 and 7.

pation necessary to the production" and thereby does not limit the scope of the statute to the preceding clause which deals with employees "in any other manner working on such goods."

But the petitioners urge that § 3 (j) cannot be construed literally, that Congress surely did not design the Act to apply to every employee who happens to perform services that are essential to the production of goods for commerce. But because some employees may not be within the Act even though their activities are in an ultimate sense "necessary" to the production of goods for commerce, it does not follow that no employees whose activities are "necessary" are entitled to the benefits of the Act. Section 3 (j) cannot thus be read out of the Act. The lower court in No. 924 met the petitioners' argument by finding the Act applicable to these employees because their work was "in kind substantially the same as it would be if the manufacturers employed them directly." In the immediate situation, the answer may be adequate; but as a guiding criterion it may prove too much. "Necessary" is colored by the context not only of the terms of this legislation but of its implications in the relation between state and national authority. We cannot, in construing the word "necessary," escape an inquiry into the relationship of the particular employees to the production of goods for commerce. If the work of the employees has only the most tenuous relation to, and is not in any fitting sense "necessary" to, the production, it is immaterial that their activities would be substantially the same if the employees worked directly for the producers of goods for commerce.

We agree, however, with the conclusion of the courts below. In our judgment, the work of the employees in these cases had such a close and immediate tie with the process of production for commerce, and was there-

fore so much an essential part of it, that the employees are to be regarded as engaged in an occupation "necessary to the production of goods for commerce." What was said about a related problem is not inapposite here: "Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution such as 'interstate commerce,' 'due process,' 'equal protection.' In maintaining the balance of the constitutional grants and limitations, it is inevitable that we should define their applications in the gradual process of inclusion and exclusion. There is thus no point in the instant case in a demand for the drawing of a mathematical line. And what is reasonably clear in a particular application is not to be overborne by the simple and familiar dialectic of suggesting doubtful and extreme cases." *Santa Cruz Co.* v. *Labor Board,* 303 U. S. 453, 467. "What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation." *Gully* v. *First National Bank,* 299 U. S. 109, 117.

A final objection to the decisions below need not detain us long. The petitioners' buildings cannot be regarded as "service establishments" within the exemption of § 13 (a) (2). Selling space in a loft building is not the equivalent of selling services to consumers, and, in any event, the "greater part" of the "servicing" done by the petitioners here is not in intrastate commerce. The suggestion that the Act, if applied to these employees, goes beyond the bounds of the commerce power is without merit. *Labor Board Cases,* 301 U. S. 1; *United States* v. *Darby, supra; Opp Cotton Mills* v. *Administrator, supra.*

In both cases the judgment is

*Affirmed.*

MR. JUSTICE ROBERTS:

I dissent. I think the power of Congress does not reach the purely local activities in question. If it did, the commerce power alone would support regulation of any local action, since it is conceivable that such activity, however remotely, "affects" commerce or is "necessary" to the production of goods for commerce.

But I am convinced that Congress never intended by the statute to reach the employees of the petitioners. Neither the words of the Act, nor its legislative history, nor the purpose to be served, requires the application of the statute in these cases.