**SCOTT v. FORD, BACON & DAVIS, Inc.**

**No. 3357.**

District Court, E. D. Pennsylvania.

July 20, 1944.

Mark C. McQuillen and Darlington Hoopes, both of Reading, Pa., for plaintiff.

Ballard, Spahr, Andrews & Ingersoll and Thomas Burns Drum, all of Philadelphia, Pa., for defendants.

KALODNER, District Judge.

This action was brought under Section 16(b) of the Fair Labor Standards Act 1938, 52 Stat. 1069, 29 U.S.C.A. § 216(b), to recover damages and alleged unpaid overtime.

The sole issue for determination is whether the plaintiff comes within the protection of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.

A jury trial was waived, and the case was submitted upon the pleadings and additional testimony. Accordingly, I make the following

## Findings of Fact

1. Ford, Bacon & Davis, Inc., was employed by the Defense Plant Corporation, a corporation created by the Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, 15 U.S.C.A. § 606b to build and construct a large factory outside of Pottstown, Pennsylvania, for the manufacture of aircraft engines and parts.

2. Mr. Frank Heyd was chief engineer for Ford, Bacon & Davis, Inc., in charge of construction, and he employed the plaintiff, Albert C. Scott, as a concrete inspector.

3. Scott's duties were to see that the designed specification for making concrete was followed, that is, the amount of cement, stone, water and sand were properly weighed and batched into each mix.

4. The water used in the batching machine came from a 50,000 gallon tank located on the premises. In the early part of August, 1942, the tank frequently became empty with the result that no water was available for batching purposes. Since Scott would be the first person to notice this shortage, Heyd instructed him to assume the responsibility for keeping the 50,000 gallon tank filled.

5. The 50,000 gallon tank was connected to pumps designated as Nos. 1 and 3, and although it supplied water for construction purposes, substantially more than half was used as drinking water at the plant and for sanitary purposes.

6. Scott was instructed to start these pumps at 7 A. M. so that there would be sufficient water for batching purposes at 8 A. M. It was only necessary to throw a switch to start the pumps, and it was necessary to shut and open two valves to allow the water to go up to the 50,000 gallon tank. The whole operation required about ten minutes; it was approximately a five minute job to shut them down. The same procedure was followed about 3 P. M. Scott could estimate, by the pressure gauge, how much water was required to fill the tank, and it was a simple matter to figure out how long it would take. Scott was instructed to see that the tank was filled and that it did not overflow; he was not instructed to sit at the pump house, and he was expected to attend to his duties at the batch plant.

7. There was a 150,000 gallon tank which was used for fire protection. It was part of construction responsibility to see that this tank was filled, since construction work is also a fire hazard.

8. The 150,000 gallon tank could be checked by gauges, and it was necessary to fill it approximately once a week. Scott was instructed to check these gauges and fill the tank. It took approximately ten minutes to adjust the valves and throw the switch to turn on the pumps, and it was a simple matter to determine how long it would take to fill the tank. Scott had to return to the pump house to turn off the pumps, but in the meantime it was his responsibility to be at his batch plant checking the mix.

9. During the period in controversy, Scott worked seven days per week and his average work week was approximately 65 hours, and his average work day between nine and ten hours.

10. Only a very small part of Scott's time was used in turning on and shutting off the pumps and filling the tanks.

## Discussion

■ There is no doubt that the determination of whether an employee is covered by the Fair Labor Standards Act is an individual matter depending on the na-

ture of the employment of the particular employee. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 524, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460. The rule is succinctly stated in the latter case (317 U.S. at page 571, 63 S.Ct. at page 337, 87 L.Ed. 460): "The fact that all of respondent's business is not shown to have an interstate character is not important. The applicability of the Act is dependent on the character of the employees' work." This view was adopted by the Wage and Hour Division prior to the Supreme Court's expression: Interpretative Bulletin No. 1, Paragraph 3, October 12, 1938, 2 C.C.H. Labor Law Service Sec. 32,101; Abram v. San Joaquin Cotton Oil Co., D.C.S.D.Cal., 1942, 46 F.Supp. 969, 973; Samuels v. Houston, D.C.S.D.Ga., 1942, 46 F.Supp. 364, 366.

There is also no doubt that insofar as defendants were engaged in local construction, they were not within the Act. Interpretative Bulletin No. 5, Paragraph 12, November, 1939, 2 C.C.H. Labor Law Service Sec. 32,105; Barbe v. Cummins Const. Co., D.C.D.Md., 1943, 49 F.Supp. 168.

Finally, it is not disputable that insofar as water was supplied to the Jacobs Aircraft Engine Corporation it was essential, and so closely connected with the manufacture of goods for interstate commerce as to bring it within the purview of the Act. Since the testimony was that substantially more than half the water from the 50,-000 gallon tank was used by the Jacobs plant, it is necessary to consider the whole pumping operation as being connected with the manufacture of goods for interstate commerce, even though the rest of the water was used for construction purposes.

The narrow question of the case, therefore, is whether a substantial part of plaintiff's activities related to producing goods for interstate commerce, or more precisely, to operating the pumps and filling the tanks. Unless a substantial part of his activities was so devoted, he does not come within the Act. The test is unqualifiedly stated in the Jacksonville Paper Co. case, 317 U.S. at page 572, 63 S.Ct. at page 337, 87 L.Ed. 460: "If a substantial part of an employee's activities related to goods whose movement in the channels of interstate commerce was established by the test we have described, he is covered by the Act." This has been followed in Ouendag v. Gibson, D.C.W.D.Mich., 1943, 49 F.Supp. 379,

382; Samuels v. Houston, supra, 46 F. Supp. at page 366; cf. Green v. Riss & Co., Inc., D.C.W.D.Mo., 1942, 45 F.Supp. 648; and see Wage and Hour Division Opinion Letter, Sept. 30, 1943, 2 C.C.H. Labor Law Service Sec. 33,020.

On the evidence in this case, I am of the opinion that Scott's activities in connection with the operation of the water pumps did not constitute a substantial part of his work week.

It is not necessary to fully recite the conflicting testimony in this case. I have given full credence to the testimony of Mr. Heyd. Plaintiff claims that he spent from 7 A. M. to 10:30 A. M., and from 3 P. M. to 6:30 P. M. at the pump house and that out of this time he spent one to two hours in connection with starting up the pumps for the 50,000 gallon tank and about forty-five minutes to an hour in connection with the 150,000 gallon tank. According to Scott, it was necessary to stay at or in the vicinity of the pump house in order to watch for overflow because he was not able to determine how long it would take to fill the tanks. However, I have expressly found that there were gauges for both tanks which would enable one to determine simply how long it would take to fill the tanks, and I have also found that in order to fill the tanks it was only necessary to adjust two valves and throw a switch.

Plaintiff asserts that regardless of what was required to be done to the tanks he did spend approximately seven hours a day at the pump house, and that should be determinative. With this contention I cannot agree. Scott's principal employment was that of cement batch inspector. The nature of his duties in that capacity, his expertness, the importance of checking the mix, and the responsibilities of his position are inconsistent with the notion that it was intended he spend as much as seven hours out of a ten hour day at the pump house, mostly just sitting there. This is even more significant in view of the fact that no person was to substitute for Scott at the batching plant during his absence, and the fact that tending pumps is hardly more than a janitorial service while inspecting the mix and the duties related thereto require some degree of expertness, skill and judgment. Scott was instructed to see that the tanks were filled, but he was also expected to continue his duties as inspector. He admitted that during the

periods mentioned he would make several trips to the batching plant, and another witness testified it was often necessary to call Scott from the pump house to check the mix. To give plaintiff credit for the time spent sitting in the pump house when he should have tended his duties as inspector would, in effect, allow him to stretch an incidental matter to large proportions just to bring himself within the Act.

Accordingly, I state the following

### Conclusions of Law

1. An employee engaged in the construction of a factory is not engaged in commerce or the production of goods for commerce within the meaning of the Fair Labor Standards Act.

2. An employee who is hired as a concrete inspector in connection with construction of a factory is not engaged in commerce or the production of goods for commerce within the meaning of the Fair Labor Standards Act where an inconsequential portion of his activities consisted of operating pumps to fill tanks, where the water therefrom was used by the factory as well as for construction purposes.

3. The plaintiff was not engaged in commerce or production of goods for commerce within the Fair Labor Standards Act, and is not entitled to recover any sum in this cause.

An order may be submitted in accordance with the above.