**WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. AMIDON.**

Civil Action No. 767.

District Court, D. Colorado.

March 10, 1945.

Douglas B. Maggs and Archibald Cox, both of Washington, D. C., Reid Williams, of Kansas City, Mo., David S. Polier, of Washington, D. C., Herman Corenman, and Joseph I. Nachman, of Washington, D. C., for plaintiff.

McHendric, Burris & Pointer and William T. Burris, all of Pueblo, Colo., for defendant.

SYMES, District Judge.

This matter was submitted to the court on final hearing on an agreed statement of facts. Each party has filed a brief. It appears the defendant for many years has been the sole owner and operator of a business and manufacturing plant in Pueblo, Colorado, producing and selling sand and gravel, employing six men.

The plant consists of a sand and gravel screening and mixing plant on the Fountain River at Pueblo. From a sand pit on the nearby hillside moulding and core sand is extracted, sold and delivered to the Colorado Fuel and Iron Corporation for the moulding of castings used at its steel plant

only in the making of repairs to the latter's manufacturing equipment. The sand extracted from the hillside pit is very fine and is mixed by defendant with sand from the river, according to specifications of the Fuel Company, and used in its steel mill. Other grades of sand are produced by defendant.

This mixture of sand is used exclusively by the Fuel Company at its plant near Pueblo for a specific purpose. This particular cast shed sand is sold exclusively to the Fuel Company and the defendant is the sole supplier, there being no one else in the neighborhood engaged in the production of this kind of sand.

Defendant's employees work interchangeably in the various operations connected with the mining, hauling, loading, screening of the sand and gravel by defendant at his pits and mixing plant. During the last months of 1943 the Fuel Company purchased cast shed sand in the amount of $5,000 and over from the defendant. This comprises 93% of defendant's business.

The Fuel and Iron Company is an extremely large corporation owning and operating a large steel mill at Pueblo manufacturing pig iron and steel, making steel rails, beams, castings, wire products and numerous other iron and steel commodities shipped in interstate commerce to all parts of the United States and the world.

The cast shed sand furnished by the defendant to the steel corporation is used primarily in processing its blast furnace operations as follows: The molten metal—the product of the blast furnaces—flows through a series of troughs to the ladle cars. These troughs are lined with the cast shed sand. The molten metal which flows through these troughs contains slag and other foreign elements which are skimmed from the metal as it flows to the ladle cars and dumped on the slag pile, while the ladle cars containing the molten metal are taken to the open hearth furnaces and subjected to further treatment and processed into rails, iron rods, beams, wire, nails and other steel products sold and delivered in interstate commerce.

The sand in question thus used to line the troughs, protects the same from the intense heat of the molten metal and prevents the molten metal from sticking to the troughs. Some kind of sand must be used at this stage of the manufacturing process.

At frequent intervals the troughs must be relined with sand because the latter is transposed by the heat of the molten metal into slag and becomes useless. The surface of the sand lining is cleaned of slag after each run.

For many years the Fuel Company has had a regular contract with the defendant to supply its needs for such cast shed sand and the defendant has regularly sold and delivered the same to the Fuel Company when it had such sand available. The Fuel Company has been the defendant's only customer for this particular type of sand and the latter is the sole supplier of the same to the Steel Company.

Further this sand and gravel is produced by the defendant in Colorado and sold and delivered to its customers within the State.

The complaint of the Government is that the defendant has on various and repeated occasions worked its employees in and about its business for more than 40 hours in the work week, and that the said employees have not been paid time and one-half for the hours worked in excess of 40 hours.

The defendant has not complied with § 7 of the Fair Labor Standards Act, 29 U.S. C.A. § 207, and resists the application of said § 7 to his employees.

It is also stipulated that if the defendant's employees are covered by the Fair Labor Standards Act the relief demanded in the complaint should be granted. The Fair Labor Standards Act provisions here involved are:

"§ 3(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

"§ 7(a) No employer shall, execpt as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce— * * *

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a

rate not less than one and one-half times the regular rate at which he is employed." "§ 13(a) The provisions of sections 6 and 7 shall not apply with respect to * * * (2) any employee engaged in any retail * * * establishment the greater part of whose selling * * * is in intrastate commerce." 29 U.S.C.A. §§ 203(j), 207(a)(3), 213 (a) (2).

The questions presented are: 1. Whether the defendant's employees are engaged in the production of goods for commerce within the meaning of § 3(j) of the Act, and: 2. Whether the defendant's employees are employed in a "retail establishment" within the meaning of § 13(a) (2) of the Act.

The Government contends the defendant's employees are necessarily employed in the production of goods for commerce within the Act.

We can narrow the issues and discussion by stating certain premises established by the stipulation: (1) Defendant's employees produced sand sold to and used by the Fuel Company to line the troughs as described. (2) In the course of the manufacturing process the sand in question is used up and thrown out and does not become an ingredient of the finished product produced for commerce. (3) The use of sand is necessary for the efficient and unhampered flow of the molten metal through the troughs and in the manufacturing process. (4) The defendant's sand has no peculiar quality or virtue not found in other sands from the Fountain River. (5) It does not appear that the Fuel Company could not obtain sand from other sources.

The Government brief admits an analytical chain of causation can be carried too far, i. e., workmen cannot work without tools, food, clothing and shelter at night, and these needs cannot be met without still other supporting activities. Thus by tracing each step back through all the contributing occupations every activity might be linked to the production of goods.

The Government recognizes what is "necessary to the production" of goods is a question of degree and that a limit more or less arbitrary must be marked out along this endless chain of cause and effect. Without arguing further, however, the Government relies upon decisions of the Supreme Court said to be decisive of the issues presented.

It would seem that the Fuel Company, operating blast furnaces and a large steel mill with raw materials consisting of iron ore, limestones, coal, coke, etc., coming from other states, is not dependent upon the insignificant local operation of the defendant's business—the total sales of which to it amount to a little over $5,000 per annum.

Furthermore, it is admitted the sand in question is used up in the manufacturing process, skimmed off the molten metal and eventually discarded as slag, and does not become a constituent part of the product shipped in commerce by the Fuel Company. Therefore we have a situation where the product the defendant supplies and its workmen mine and handle does not actually become a part of the product that the Fuel Company ships in interstate commerce. Nor is it necessary to the production thereof. It therefore is not delivered into the hands of the ultimate consumer after an interstate transportation. For this reason the two ice cases cited by the Government, Hamlet Ice Co. v. Fleming, 4 Cir., 127 F.2d 165 and Chapman v. Home Ice Co., 6 Cir., 136 F.2d 353, are not in point. For in those cases the court held the Act applied to employees of the defendant engaged in the production of goods for interstate commerce, because the ice it manufactured was sold to three interstate carriers by rail and loaded into bunkers of dining cars and Pullmans for icing foods and beverages, and was thus actually carried into other states. It was also used to ice perishable commodities in transit in interstate commerce.

Reynolds v. Salt River Valley Water Users Ass'n., 143 F.2d 863—a late case in the Ninth Circuit—is also relied upon by the Government. That case held the employees of a water association or irrigation company engaged in directing the flow of irrigation water, maintaining the ditches, etc. through which the water flows, and operating service pumps which used and caused electricity originating outside the state to flow through the association's lines, were engaged in the production of goods in interstate commerce within the Act we are considering.

That court, however, recognized that in these broad statutory enactments regulating processes and conduct, there is a borderline between remote and immediate participation, stating 143 F.2d at page 867:

"As in all such broad statutory enactments regulating processes and conduct, there is a borderline between remote and immediate participation. Here the irrigating water is not only a causa sine qua non but one of the several proximate causes of vegetable growth. Its intimate immediacy is obvious. Quantitatively, the major content of these cantaloupes, watermelons, lettuce, cabbage, broccoli, and carrots is the water which has been in part pumped for and all of it directed toward the plant roots by the appellee's employees."

The court thus found that the water which the employees handled was actually shipped in interstate commerce.

It serves no useful purpose, however, to attempt to run a line and place on one side or the other the very numerous cases cited in the respective briefs.

The leading case construing this Act is Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, in which the Supreme Court held it applicable to building employees engaged in the maintenance and operation of a loft building, the tenants of which are engaged principally in the production of goods for interstate commerce, holding the employees, including engineers, firemen, elevator operators, watchmen, porters, carpenters and electrician, who perform the customary duties of persons charged with the maintenance of the building, are within the Act because, as Mr. Justice Frankfurter says, the engineer and firemen produce heat the steam necessary for the manufacturing operations, and keep the elevators and radiators in repair, the electrician maintains the light and power, the elevator operators run both the freight elevators, which start and finish the interstate journeys of goods going to and from the tenants, and the elevators carry employees, customers, salesmen and visitors. The watchmen protect the building from fire and theft, while the porters keep the building clean and habitable and the carpenters make repairs.

And further, 316 U.S. 517 at page 524, 62 S.Ct. at page 1120, 86 L.Ed. 1638:

"Without light and heat and power the tenants could not engage, as they do, in the production of goods for interstate commerce. The maintenance of a safe, habitable building is indispensable to that activity."

But, as the opinion points out, it is impossible to find a dependable touchstone to determine in a particular case whether employees are engaged in commerce or in the production of goods for commerce.

The opinion further says, 316 U.S. 517 at page 521, 62 S.Ct. at page 1119:

"We cannot, therefore, indulge in the loose assumption that, when Congress adopts a new scheme of federal industrial regulation, it thereby deals with all situations falling within the general mischief which gave rise to the legislation."

And, 316 U.S. 517 at page 521, 62 S.Ct. at page 1119:

"Congress may choose, as it has chosen frequently in the past, to regulate only part of what it constitutionally can regulate, leaving to the States activities which, if isolated, are only local."

And further, 316 U.S. 517 at page 523, 62 S.Ct. at page 1120:

"Since the scope of the Act is not coextensive with the limits of the power of Congress over commerce, the question remains whether these employees fall within the statutory definition of employees 'engaged in commerce or in the production of goods for commerce', * * *."

The opinion then points out that the Fair Labor Standards Act, unlike others,

"puts upon the courts the independent responsibility of applying ad hoc the general terms of the statute to an infinite variety of complicated industrial situations. Our problem is, of course, one of drawing lines."

This opinion indicates clearly the rule of decision applicable to this case and most of those arising under this Act. The activities of the workmen in question, while in one sense logically necessary if attached as a link in the long chain of causation, would lead to absurd results not intended by the Congress, nor required under a statute so general in its terms. It would violate the common-sense and independent interpretation of the Act enjoined upon the lower courts. Nor are we confronted with one of the situations that gave rise to the legislation. The activities of the defendant are not indispensable to the production of steel at the Fuel Company's plant and, as pointed out, the participation of the employees in question is very remote.

Clearly Congress did not intend to regulate every step in the chain of causation however remote that might be linked to the Fuel Company's interstate business. Fur-

thermore, the defendant's product did not become an ingredient of the goods produced for commerce. And, as stated by Mr. Justice Frankfurter in Kirschbaum v. Walling, supra, 316 U.S. 517 at page 526, 62 S.Ct. 1116, 86 L.Ed. 1638—quoting from Gully v. First Nat. Bank, 299 U.S. 109, at page 117, 57 S.Ct. 96, 81 L.Ed. 70—what is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterize the law in its treatment of its problems of causation.

If the Act reached the activities in question, the commerce power alone would support regulation of any local action, since such activity, however remote, affects commerce, or is necessary to the production of goods for commerce. See New Mexico Public Service Co. v. Engel, 10 Cir., 145 F.2d 636.

The second question must be answered in the negative under the authority of the Kirschbaum case, supra, 316 U.S. 517 at page 526, 62 S.Ct. 1116, 86 L.Ed. 1638.

Judgment for defendant.

Let findings of fact and conclusions of law be prepared by defendant and presented on five days' notice.