**TOBIN, Secretary of Labor v. PROM-
ERSBERGER et al.**

**TOBIN, Secretary of Labor v.
JOHNSON.**

**TOBIN, Secretary of Labor v.
LaBOUNTY et al.
Civ. Nos. 973, 999, 993.**

United States District Court
D. Minnesota, Fifth Division.

March 31, 1952.

William S. Tyson, Solicitor, Jeter S. Ray, Associate Solicitor, John J. Babé, Asst. Solicitor, Herman Grant, Regional Attorney, all of Washington, D. C., and Edward J. Calihan, Jr., Attorney, of the Wage and Hour Division, United States Department of Labor, all of Chicago, Ill., for plaintiff.

Thomas M. McCabe, of Duluth, Minn. (McCabe, Gruber, Clure, Donovan & Crassweller, of Duluth, Minn., of counsel), for defendants.

NORDBYE, Chief Judge.

The above cases have been consolidated for trial and submitted to the Court for decision without a jury. The facts are stipulated. In each case the defendant or defendants operate a logging camp in northern Minnesota. These camps consist of bunkhouses, cookhouse, barns, machine sheds, offices, and other similar structures required by logging camps. Water wells, electrical equipment, and machinery and tools required for logging operations are maintained at the camp. The cost to establish the Promersberger camp was approximately $82,000, the Johnson camp approximately $150,000, and the LaBounty camp approximately $50,000. Each defendant employs men called piece cutters, skidders, teamsters, and truck drivers to fell, limb, buck, pile, skid, load, and haul the timber and pulpwood which defendants' operations remove from the forests. They perform their work outside the camps. But the stipulation indicates that all of these workers live at the camp either in the bunkhouses or in other accommodations made available to them by defendants. The overwhelming number of them also eat their meals at the cookhouse. Breakfast is served between 6:30 A.M. to 7:00 A.M. Breakfast is eaten in about a half hour's time. The men are awakened by the cookhouse horn about fifteen minutes before breakfast is ready. The workers return to the cookhouse from the forest for their noon meal unless the distance is too great or the weather is bad. If the distance or the weather prevent the return for the noon meal, it is sent to them in the forest from the cookhouse or the men take their meal with them in the morning from food provided by the cookhouse. Supper is

served about 5:00 P.M. or 6:00 P.M. A few of the workers cook their own meals at quarters made available to them by defendants. The pulpwood, lumber, or mining timbers which defendants' employees fell, etc., is hauled to the respective paper, mining, or box company with which the particular defendant has a contract, and these companies process it and ship, deliver, and sell a substantial portion of the processed product in interstate commerce. Defendants have known this at all times relevant to this proceeding, and they concede for the purposes of this action that the activities of all the above employees who perform logging and timber operations constitute the production of goods for commerce within the meaning of the Fair Labor Standards Act, as amended, 29 U.S. C.A. § 201 et seq.

Among the defendant Promersberger's employees at the camp are a cook, a cookee, a bull cook, a barn boss, a watchman, and a clerk. Defendant Johnson's camp employees include a cook, a cookee, and a bull cook. Defendant LaBounty's camp employees include a cook and a bull cook. In the Promersberger camp the cook prepares all meals—breakfast, lunch, supper, and evening snacks—and works between the hours of approximately 5:00 A.M. and 7:30 P.M., with certain hours off in between. He supervises the cookee and bull cook and keeps track of their time. He can allow them overtime. He oversees the kitchen and the mess hall, which, together with the cook's living quarters, comprise the cookhouse.

The cookee at the Promersberger camp is the assistant cook. He peels potatoes and other vegetables and carries out the duties assigned to him by the cook. He sets the tables for meals and evening snacks, serves the food to the men, washes the dishes and containers, cleans the dining tables, benches, and work table, and sweeps and mops the cookhouse daily.

The bull cook works under the cook's supervision. He splits wood for fuel, fires and checks all camp heating stoves, pumps and carries all water consumed in the cookhouse, bunkhouses, and office, and performs all housekeeping duties, including such chores as sweeping and mopping floors, removing ashes, and cleaning spittoons. He keeps the bunkhouses clean and assists the cook in cleaning the kitchen after meals. He also keeps all camp lanterns in readiness in event of electric light and power plant failure, and he keeps the light and power plant filled with gas and oil. That plant furnishes electrical power for the camp and for the machinery used to sharpen the axes, drills, and other equipment used in the production of timber and pulpwood.

The barn boss performs all activities in caring and feeding the horses used in the operation. He also repairs harness and hitching equipment and is in charge of the barn where the equipment used in skidding and other logging operations is stored.

The watchman guards the buildings and equipment at night against fire and other hazards. In cold weather he makes the rounds every half hour and keeps the heating stove fired. He also checks the horses in the barn during the night and splits wood. At times he helps the bull cook. In the morning he carries fresh water to the bunkhouses and cookhouse.

The clerk maintains camp records. These records include production records, time cards, wage records, and commissary records. He has charge of the camp store, maintains an inventory of camp equipment, orders gasoline, oil, axes, saws, ropes, cables, and other logging equipment. He makes out all reports, including social security, income tax, etc., and purchases food and kitchen supplies requested by the cook.

In the Johnson camp the duties of the cook, cookee, and bull cook are essentially like those of the cook, cookee, and bull cook in the Promersberger camp, except that the bull cook in the Johnson camp does not keep the power plant filled with gas and oil. The duties of the cook in the LaBounty camp are essentially like those of the other camps, but the bull cook apparently performs the duties of both the cookee and the bull cook of the other camps, and he does not keep the power plant supplied with fuel.

Practically all of the defendants' operations are carried on from their respective

camps. The stipulation indicates that all the above noted workers live there, and the overwhelming number eat at the cookhouse. A few cook their own meals. The camps are substantial distances from town, and during the so-called ice and snow hauling season of December to March, the logging roads from camp to town as well as the forestry roads and state roads to town are blocked with snow several times each month. Up to forty-eight hours often are required to open those roads. For several months after March (during the "breakup" when the snow is melting and the ground is soft) the camps usually suspend operations, and the roads are difficult to traverse because of their condition. But the camps usually begin to operate again thereafter on a limited scale for the felling, limbing, bucking, etc., of the timber. Most of the felling, piling, and cutting occurs from about October to March. The hauling is done principally during the ice and snow hauling season over the frozen roads and trails. So except for a period of about two months, the camps tend to operate the entire year. When the roads are not blocked, the employees obtain transportation to town upon defendants' vehicles. Only a very small percentage of employees possess their own vehicles. The Promersberger camp is 18 miles from Littleford, Minnesota, and 15 miles from Big Falls, Minnesota. The Johnson camp is 18½ miles from Ely, Minnesota, and the LaBounty camp is 25 miles from Ely and 65 miles from Two Harbors, Minnesota.

Many employees work five days each week, but the cookhouse operates and the cookhouse employees work seven days per week because those employees who do not leave the camp must be fed.

Defendants concede for the purposes of this proceeding that defendants are engaged in the production of goods for commerce, that the employees engaged in felling, limbing, bucking, and hauling the timber and pulpwood are engaged in the production of goods for commerce, that defendants did not pay the camp employees overtime compensation at the rate prescribed by Section 7 of the Fair Labor Standards Act, that the camp employees were covered by the Fair Labor Standards Act prior to January 25, 1950, because those employees were engaged in occupations *necessary* to the production of goods for commerce within the meaning of the Act, and that defendants failed to keep adequate and accurate records of the hours worked each workday and workweek as charged in Paragraph VII of the complaint.

The sole issue here is whether the camp employees (cooks, cookees, bull cooks, barn boss, watchman, and clerk) have been producing goods for commerce within the meaning of Section 3(j) of the Act since January 25, 1950. That section had been amended to read as follows:

"Sec. 3(j)— * * * for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or *in any closely related process or occupation directly essential to the production* thereof, in any State."

The specific issue, therefore, is whether the camp employees are employed in an occupation or process which is closely related or directly essential to the production of timber and pulpwood by these defendants.

They clearly were covered by the Act prior to the above amendment. Hanson v. Lagerstrom, 8 Cir., 133 F.2d 120; Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. And consideration of the instant situation requires the conclusion that the amendment to the Act upon which defendants rely did not change the status of the employees here involved.

These logging camps are an integrated operation. They are far from town, and the transportation to town is very poor. Employees are dependent upon defendant's vehicles for transportation, and the stipulation does not indicate that the vehicles are available at the convenience of the employees. At times the camps are completely isolated because of road conditions. Snow and rain make the road conditions quite

undependable for substantial periods of time. That the men cannot always get to town for meals or quarters is apparent. The time consumed in travel is longer than the time allowed for meals at the camp. It seems evident that as a practical matter the employees are forced by circumstances to eat and live at the defendants' camps. The importance of feeding the men and lodging them comfortably is demonstrated by defendants' desire to obtain good cooks, keep good health standards, and serve good food at no profit. The evidence clearly justifies the conclusion that good food and lodging was necessary to obtain employees, and to abide by the union contract so that continued production would be possible. From the facts, it is apparent that the logging operations as conducted by defendant could not have been conducted without the cookhouse. Likewise, the cookhouse could not have been operated without the logging operations. Each is a part of, and dependent upon the other. The mere fact that some of the employees may cook their own meals is not persuasive on these facts. The overwhelming number take their meals at the cookhouse.

In Hawkins v. E. I. Du Pont de Nemours & Co., 4 Cir., 1951, 192 F.2d 294, the employees involved worked at the defendant's restaurant which was operated in conjunction with defendant's manufacturing plant. The plant employees were not free to leave the plant because they were under guard during working hours. The plant cafeteria was the only place available to them to eat. The Court of Appeals, reversing the trial court, held that under these circumstances the work of the cafeteria employees was covered by the statute because they were engaged in an occupation *directly essential to the production of goods* for interstate commerce. Hanson v. Lagerstom, supra, was cited as supporting the court's conclusion. The Hanson case involved a lumber camp situation essentially like the instant one. In fact, the plaintiff there was a cookee.

Likewise, the Interpretative Bulletin of the Wage and Hour Administrator, effective May 17, 1950, declares that a company's restaurant employees may not generally be engaged in work "closely related" and "directly essential" to the production of goods for commerce, but that "Such employees are to be distinguished from cooks in isolated lumber camps or mining camps, where the operation of a cookhouse may in fact be 'closely related' and 'directly essential' or, indeed, indispensable to the production of goods for commerce."

Defendants cite legislative history to the effect that restaurant employees were not intended to be within Section 3(j) of the Act. But it is obvious that the legislators making the comments cited by defendants were speaking of the usual, common situations, not of those cases which, like the instant case, are not the usual, prevalent variety. The legislative history aptly shows that the principle of Kirschbaum Co. v. Walling, supra, was not destroyed by the amendment. 95 Cong.Rec. 14928–14929. There, janitors, mechanics, porters, engineers, and watchmen were involved. They kept the building and machinery operating so that tenants of the building who produced goods for commerce could operate. That the feeding of the defendants' employees here was as directly essential to the production here as the duties performed by the Kirschbaum employees was essential to the production in that case seems evident. As the Court of Appeals for the Fourth Circuit pointed out in the Du Pont case, supra [192 F.2d 296], "the feeding of employees conveniently so that they need not leave the plant is an effective step in maintaining production." Here, the feeding was mandatory as a practical matter. The instant case is within the spirit of the Kirschbaum case with respect to the cooks and cookees. They are within the provisions of Section 3(j). Inasmuch as the bull cook's duties in the LaBounty camp are essentially like the cookee's duties in the other camps, he also is within the Act under the above premises.

The bull cooks of the Promersberger camp and the Johnson camp also are within the Act in view of their relationships to the cookhouse, and the similarity of their duties to those of some of the employees involved in the Kirschbaum case. Their duty to keep the bunkhouses, etc., clean

318

obviously is analagous to the duty of the porters in the Kirschbaum case to keep the buildings therein involved clean and habitable.

Consideration of the duties of the barn boss, watchman, and clerk of the Promersberger camp establishes that those employees are essentially maintenance, custodial, and clerical help who are closely related to and directly essential to the logging operation which produces goods for commerce. The Kirschbaum case covered similar workers. Kirschbaum Co. v. Walling, 316 U.S. 517, at page 519, 62 S.Ct. 1116.

And the statement of the Conferees of the House declared, in part,

"* * * the proposed changes are not intended to remove from the act maintenance, custodial, and clerical employees of manufacturers, mining companies, and other producers of goods for commerce. Employees engaged in such maintenance, custodial, and clerical work will remain subject to the act, * * *. All such employees perform activities that are closely related and directly essential to the production of goods for commerce.

"The bill * * * does not affect the coverage under the act of employees who repair or maintain buildings in which goods are produced for commerce (Kirschbaum Co. v. Walling, 316 U.S. 517 [62 S.Ct. 1116, 86 L.Ed. 1638]) or who make, repair, or maintain machinery or tools and dies used in the production of goods for commerce, * * *."

Compare statement of majority of Senate conferees, 95 Cong.Rec. 14874–14875. See also Tobin v. Cherry River Boom & Lumber Co., D.C., 1952, 102 F.Supp. 763.

In view of these premises, therefore, the cooks, cookees, bull cooks, barn boss, watchman, and clerk herein are within the provisions of Section 3(j) of the Fair Labor Standards Act, as amended. The injunction may issue as prayed.

Findings of fact and conclusions of law in harmony herewith may be submitted. An exception is reserved to the defendants.