LEBLEU et al. v. TEMPLE ASSOCIATES, Inc.

BILLEAUDEAU v. TEMPLE ASSOCIATES, Inc.

Civ. Nos. 4247, 4159.

United States District Court, W. D. Louisiana, Opelousas Division.

Oct. 30, 1953.

Tate & Fusilier, Ville Platte, La., for plaintiffs.

Dubuisson & Dubuisson, Opelousas, La., Peavy & Shands, Lufkin, Tex., for defendant.

DAWKINS, Jr., Chief Judge.

Five plaintiffs[1] sue defendant here under the Fair Labor Standards Act of 1938, §§ 1–19, as amended, 29 U.S.C.A. §§ 201–219, for minimum wages and overtime pay.

The actions arise from work performed upon a construction project. On April 5, 1952 defendant's predecessor[2] entered into a contract with the Housing Authority of the city of Ville Platte, Louisiana, in which it agreed to "furnish all labor, material" * * * etc., * * * "and perform all work required for the construction and completion" * * * of two low-rent housing projects. Construction was completed February 18, 1953.

Plaintiffs allege they were employed by defendant or its predecessor, for various periods during the construction, as "day and night guards or night watchmen". Their duties, they assert, required them to guard (among other things) defendant's construction office * * * "in which office were maintained pay-roll records, time sheets, and other matters pertaining to the labor force, which were regularly shipped to Dibold, Texas, and to other points outside of Louisiana, as well as invoices, plans, specifications, and other matters and materials regularly shipped to and from Ville Platte, Louisiana, and points outside of Louisiana; in addition, as part of their duties, plaintiffs often received lumber shipped from Dibold, Texas, and the invoices therefor, and guarded the Texas employees unloading same, and were responsible for filing the invoices for such lumber and other materials received in the office-building on the premises, and were often present in the course of their duties when other shipments or supplies were being unloaded or loaded for shipment to and from points of Louisiana."

They were paid, they say, only $35 for a work week of eighty-four hours or longer, far less than the minimum hourly rate[3] and without overtime pay[4] as prescribed by the Act. They sue here for the differences, plus interest, liquidated damages and attorney's fees.

Defendant has moved to dismiss, for failure to state valid claims, and for summary judgment, the latter motion being supported by affidavits. We here consider the motions together, as if only for summary judgment.

It is urged, in support of the motions, that the housing units were "new construction not yet dedicated to interstate commerce", and that employees on such projects do not come within the purview of the Act. Plaintiffs, on the other hand, earnestly contend it is the nature of the employees' duties, not of their employer's activities, which governs. Since, they say, their duties here encompassed direct contact with and responsibilities affecting items of interstate commerce,[5] they feel their right to recovery is established.

From the pleadings and briefs it is evident—indeed, plainly apparent—there is no dispute as to the facts of the case.

---

1. One, Anzy Pitre, is now conceded not to have been employed by defendant, but by the Housing Authority.

2. Arthur Temple, Jr. & Associates, Inc., a corporation.

3. 75¢ per hour, 29 U.S.C.A. § 206.

4. One and one-half times the minimum for all hours over forty worked per week. 29 U.S.C.A. § 207.

5. As quoted from their complaints, supra.

It is only as to the legal effects of the facts that plaintiffs and defendant differ.

Until Murphey v. Reed, 1948, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410, there was some slight doubt as to the law on this rather narrow issue. By that decision the question has been set at rest.

The Murphey decision came in a short per curiam in which certiorari was granted to the 5th Circuit Court of Appeals in Reed v. Murphey, 168 F.2d 257. It read:

"The petition for writ of certiorari is granted. The judgments below * * * are vacated and the case remanded to the District Court *with instructions to dismiss those causes of action involving solely construction work,* and to reconsider the remaining causes of action in the light of the decision of this Court in Kennedy et al. v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031 [92 L.Ed. 1347]." (Emphasis supplied.)

To understand the holding fully the facts disclosed by the Court of Appeals' decision must be examined. Defendants in that case had entered into two cost-plus-fixed-fee contracts with the Navy Department for construction of certain naval installations on the Mississippi Gulf Coast.

"The defendants, in the performance of these two contracts, maintained separate and distinct organizations. Employees working under the construction contract were designated 'construction' workers, and carried on the 'construction' payroll, while employees working under the maintenance and operation contract were known as 'maintenance and operation' or 'M & O' employees, and carried on the 'M & O' payroll, which was entirely separate and distinct from the 'construction' payroll.

"The defendants and their employees commenced work under the construction contract the latter part of April, 1942. They built warehouses, buildings, barracks, mess halls, railroad spurs, a recreation hall, a laundry and other installations appropriate for Navy encampments. In addition, they constructed a rifle range and an ammunition storage depot 25 miles north of Gulfport. Actual construction in the field was begun about May 15, 1942, and was completed April 6, 1943. Approximately 5,000 employees were engaged in construction work under this contract during the peak period. *Construction materials for the project were obtained from both local and out-of-state sources. Approximately 40 per cent of the dollar value of purchase orders was issued to out-of-state vendors.*

"A number of plaintiffs employed under the construction contract worked as guards, timekeepers, material checkers, * * *. Some plaintiffs worked at several jobs in the course of their employment. The guards performed custodial duties at various posts throughout the construction area. The timekeepers kept time records of construction workers, including carpenters, concrete and steel construction workers, bricklayers, plumbers, builders and mechanics. Several timekeepers kept time records of laborers, among others, who spent part of their time unloading interstate shipments. The material checkers received and checked the materials used in the construction work as to quantity and quality. * * * The accountants, clerks, and other office personnel maintained payroll records of construction workers, prepared social security and withholding tax statements, made out vouchers and invoices covering construction materials, typed orders, maintained cost records and inventories, and performed other clerical and administrative duties incident to the construction activities.

"Under the maintenance and operation or M & O contract, the

defendants maintained and operated the Naval Advance Depot where materials and equipment were received from all parts of the United States for storage, assembly, and reshipment to 'Seabee' Construction Battalions at advance bases in the various war theatres. Additional duties of the defendants under this contract included purchase, assembly, fabrication, testing, and preparation of materials and equipment for shipment to these advance bases overseas.

"Nearly all the goods received at the Advance Base Depot were stored in one of the M & O warehouses or in open storage areas. The period of storage varied from a few days to several months. Incoming and outgoing shipments were of daily occurrence. Directions were received daily from Washington for the shipment of materials and equipment on hand to advance bases. All purchases were made on the basis and requirements of the Bureau of Yards and Docks, Navy Department, and defendants regularly received instructions from the Bureau regarding purchases to be made. Substantial quantities of goods were shipped on government bills of lading.

"From the inception of the work under both the construction and the M & O contracts, it is without dispute that all of defendants' activities and operations were for the benefit of the Navy in its prosecution of the war; that the defendants cooperated closely with the Navy Department, and were at all times subject to the general supervision and control of the Naval-Officer-in-Charge.

"The record discloses that of the 117 plaintiffs held entitled to recover, 89 were employed under the construction contract throughout their employment, 21 were construction employees during part, and M

& O employees during the remainder, and 7 were M & O employees throughout their employment." (Emphasis supplied.) [168 F.2d 260.]

The Circuit Court, on these facts, then held:

"The 89 construction employees were shown to be engaged solely in local intra-state building activities throughout the term of their employment. It has been uniformly held that persons employed on such work are not 'engaged in commerce or in the production of goods for commerce' within the meaning and coverage of the Fair Labor Standards Act. Parham v. Austin Co., 5 Cir., 158 F.2d 566; Phillips v. Graham Aviation Co., 5 Cir., 157 F.2d 443; Noonan v. Fruco Construction Co., 8 Cir., 140 F.2d 633; Soderberg v. S. Birch & Sons Construction Co., 9 Cir., 163 F.2d 37; Nieves v. Standard Dredging Corp., 1 Cir., 152 F.2d 719; Scott v. Ford, Bacon & Davis, Inc., D.C., 55 F.Supp. 982."

It also held that the other employees did not come under the Fair Labor Standards Act because they actually were engaged in war work for the Government, not commerce, citing Kennedy v. Silas Mason Co., 5 Cir., 1947, 164 F.2d 1016, and other authorities. On May 27, 1948, the Supreme Court granted a writ in the Kennedy case,[6] reversed and remanded it because it was felt the questions for decision were too important and far reaching in their effect upon the economy of the nation to be decided, as the case was submitted, upon motions and affidavits. That obviously was also the reason it remanded the Reed case, which reached the Court later, with instructions "to reconsider the *remaining* causes of action" in the light of the Kennedy decision, referring, of course, to the *non*-construction employees.

As to the claims of those employed in the construction operations, including among others guards, timekeepers and

---

6. 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347.

material checkers performing duties like those alleged by plaintiffs here, the Supreme Court remanded "with instructions to dismiss those causes of action".

The Wage and Hour Division of the Department of Labor has itself recognized the exemption from the Act of employees engaged in "new construction". On December 3, 1948, the Administrator issued a ruling as follows:

"Workers employed on *new construction* not yet dedicated to interstate commerce *are not covered,* but are covered if new construction is the improvement or extension of an existing facility of commerce." (Emphasis supplied.)

To the same effect are a number of decisions by Federal District and Circuit courts throughout the country: Collins v. Ford, Bacon and Davis, Inc., D.C., 66 F.Supp. 424; Cooper v. Rust Engineering Co., 187 F.2d 732; Wan v. E. E. Black, 9 Cir., 188 F.2d 558; Parham v. Austin Co., 5 Cir., 158 F.2d 566; Kenney v. Wigton Abbott Corporation, D.C., 80 F.Supp. 489.

Durkin v. C. W. Vollmer & Co., D.C., 113 F.Supp. 235, 237, held:

"It is true that the Supreme Court has held that the provisions of the Fair Labor Standards Act should be liberally construed in order to carry out the basic social purpose of the act. Tennessee Coal Co. v. Muscoda Local No. 123, 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949. However, in 1949 Congress, apparently motivated by a feeling that the courts had gone too far in extending coverage, amended the act limiting the coverage to some extent. Amendment of Oct. 26, 1949, Chapter 736, § 3, 63 Stat. 911, 29 U.S.C.A. § 203 (j). Statement of House Conferees, Report No. 1453, 81st Congress, pp. 14–15. While the amendment does not bear on the point at issue here, nevertheless, it does show that Congress in passing the Fair Labor Standards Act did not intend that

coverage under the act would be co-extensive with the power of Congress to control interstate commerce. This fact has been recognized by the courts. Kirschbaum Co. v. Walling, 316 U.S. 517, 523, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460."

Plaintiffs' diligent counsel, in a brief demonstrating intensive application to the subject, has cited a large number of cases which seem to support the position of his clients. However, all cases cited either were decided before Murphey v. Reed, supra, or deal with employees who were working on projects which were themselves actual instrumentalities of commerce. They can form no sound basis for deciding the present case, which in its final analysis involves a purely local matter—a "new construction" housing project that upon completion remains local, and is neither an instrumentality of commerce nor does it affect it.

For example, Clyde v. Broderick, 144 F.2d 348, cited by plaintiffs, was decided in 1944 by the 10th Circuit Court of Appeals, coming four years before the Reed case. In 1949 the same court in effect reversed itself in McDaniel v. Brown & Root, 172 F.2d 466. This was pointed out in Cooper v. Rust Engineering Company, D.C.1949, 84 F.Supp. 148. A quite recent decision to the same effect, in a case much stronger against the employer than is presented here, is by Judge Wright of the Eastern District of Louisiana in Durkin v. C. W. Vollmer Co., D.C.1953, 113 F.Supp. 235.

It is our opinion, therefore, and we hold, that plaintiffs, in their employment by defendant, were not engaged in activities which were (1) actually in the movement of commerce, or (2) so closely related thereto as to be considered a part thereof. Consequently, their demands must fall.

For the reasons stated the motions for summary judgment, in these consolidated cases, are sustained.