GORCHAKOFF v. CALIFORNIA SHIP-BUILDING CORPORATION.

Civil Action No. 4293–RJ.

District Court. S. D. California,
Central Division.

Oct. 9, 1945.

Albert E. Coger and Weinstein & Bertram, all of Los Angeles, Cal., for Benjamin Gorchakoff, plaintiff.

Samuel S. Gill and Thelen, Marrin, Johnson & Bridges, all of Los Angeles, Cal., for California Shipbuilding Corporation, defendant.

McCORMICK, District Judge.

This is an action brought pursuant to Section 16(b) of the Fair Labor Standards Act, 52 Stat. 1069, 29 U.S.C.A. § 216(b), hereinafter called the Act, to recover overtime compensation, liquidated damages and attorney's fees claimed to be due and unpaid under Section 7(a) of the Act, 29 U.S.C.A. § 207(a).

The paramount question and, indeed, the crucial issue of the case for the major part of the relevant period of time is the nature of the work of the plaintiff under applicable law. In other words, does the evidence establish Mr. Gorchakoff to have been employed in a bona fide administrative capacity within Section 13(a) (1) of the Act, 29 U.S.C.A. § 213(a) (1), and Section 541.2 of the regulations of the administrator of the Act?

The foreign and interstate character of defendant's business, as well as the work of plaintiff while in defendant's employ are conceded by both parties to the action, and it is also stipulated that the ships built by defendant during plaintiff's service were constructed by defendant exclusively for the United States Maritime Commission under cost plus a fixed fee contract.

It also has been agreed by the parties that:

(1) From the week ending March 6, 1942, to April 25, 1942, plaintiff was employed by defendant at an hourly rate of $1.01;

(2) Between April 26, 1942, and July 17, 1942, plaintiff was employed by defendant at a monthly salary of $250;

(3) Between July 17, 1942, and December 12, 1942, plaintiff was not in the employ of defendant, but was engaged as manager of the "Cal-Ship Club," apparently an organization frequented by workers in the shipyard;

(4) Between December 12, 1942, and February 13, 1943, plaintiff was again employed by defendant, at a monthly salary of $300;

(5) Between February 14, 1943, and June 26, 1943, plaintiff was employed by defendant, at a monthly salary of $325.

It is settled beyond dispute that before exemptions under Section 13(a) (1) of the Act are invocable the status of a particular worker in question must conform to the terms of the statute and the effective and applicable regulations of the administrator. Smith v. Porter, 8 Cir., 143 F.2d 292.

It is also clear that the burden rests on the plaintiff to prove by a preponderance of the evidence that he did not receive the wages that he was entitled to receive under the Act and to show by evidence not resting upon conjecture the extent of overtime work for which unpaid compensation is demanded. Mt. Clemens Pottery Co. v. Anderson et al., 6 Cir., 149 F.2d 461. And while it is our duty in considering actions under Wage and Hour legislation to adopt a liberal construction of the record to the end that the remedial aspects of the Act may not be whittled away by technical niceties, nevertheless in a concrete action before the court for a judgment for overtime pay it does not satisfy the requirements of the Act for the employee to base his right of recovery on a mere estimated average of overtime worked. The judgment must rest upon something more reliable and certain than conjecture and speculation.

As to the several work weeks ending March 6, 1942, to April 25, 1942, the plaintiff having been employed on an hourly wage, no question arises here as to any exemption features of the Act. The nature of the work performed by the plaintiff at such times was similar but not identical to the services performed by him later when he was under salary compensation. During the early period, as well as throughout his employment with defendant, the plaintiff's work hours were necessarily irregular and at times extended beyond applicable maximum hours, particularly on behalf of the defendant in entertainments and shows carried on to promote the sale of bonds among the personnel of the shipyard and also in arranging recreational events of the defendant in bowling alleys and other places of amusement, as part of the program of the defendant corporation. Such work was

done frequently during this early period of time after the plaintiff "clocked out" when leaving the shipyard premises. We think that the plaintiff has sufficiently sustained his right to recover the amounts shown on Exhibit 3 attached to plaintiff's "Pretrial Statement of Facts and Brief" for the eight items covering the weeks ending March 6, 1942 to and including April 25, 1942.

The unrefuted oral testimony of the plaintiff as to hours worked during such period of time in conjunction with the time card records kept by the defendant in the same period sufficiently establish unpaid overtime during such period, and as the salary elements of exemption did not exist during such period, a recovery by the plaintiff is sufficiently established.

There are two other factors shown by the evidence during the early pertinent period of plaintiff's work which support the plaintiff's claim for unpaid overtime: (1) The compensatory character, under Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, and Armour & Co. v. Wantock, 323 U.S. 129, 65 S.Ct. 165, of eating periods at which business of the defendant corporation was discussed by plaintiff and other supervising personnel of the shipyards, and also of "waiting" time; (2) the inference to be drawn from the interoffice memorandum of March 28, 1942, defendant's Exhibit "E" herein. This memorandum is the only memorial shown by the record before us of any claim for overtime pay.

We have been unable to clearly identify from the record before us two admittedly chargeable items of $12.12 in the week ending April 4, 1942. These amounts were undoubtedly paid to the plaintiff and received by him, and we think they should be deducted from the aggregate of the eight items for which judgment is ordered as aforesaid.

We turn to consider all work periods of the plaintiff subsequent to April 25, 1942, in order to determine whether plaintiff's services during such periods properly fall into the category of administrative employment.

It is well settled that before exemptions under the Act are allowable the facts and circumstances in proof in the specific case before the court must preponderate to bring the affected employee clearly within the terms of the claimed exemptions as defined and delimited by the Act and the regulations promulgated thereunder. Consolidated Timber Co. v. Womack, 9 Cir., 132 F.2d 101; Smith v. Porter, supra. We think that the record before us justifies no other conclusion than that at all times between April 25, 1942 and June 26, 1943 the plaintiff while performing services for defendant corporation was an employee employed in a bona fide administrative capacity in the business of the defendant corporation.

██ A primary essential in the classification of a worker as an administrative employee is that he.be compensated for his services on a salary basis of not less than $200 per month (exclusive of board, lodging, or other facilities). This basic requirement has been complied with as shown by the record in this action and deductions from plaintiff's salary for absences from work did not convert the contract of employment between plaintiff and defendant into an employment contract at an hourly wage so as to defeat the applicability of the statutory exemptions to the plaintiff's position. Cf. Smith v. Porter, supra.

There are conflicts in the evidence as to the nature and scope of plaintiff's work and authority, not only during the periods subsequent to April 25, 1942, but also prior to that date during his employment with the defendant, and in this situation the court should consider the plaintiff's education, business experience and contacts as helpful aids to determine from the evidence the proper classification of the positions filled by the plaintiff under the Act in the defendant's shipbuilding organization.

██ It should be noted that for an employee to attain or retain an administrative status under the Act it is not necessary that he be constantly or continuously engaged in work of a non-manual nature or wherein he is at all times required to be doing work which necessitates the exercise of discretion and independent judgment.

The rationale of the principle announced is aptly described in the pamphlet issued by the Wage and Hour Division of the Department of Labor, effective October 24, 1940, and entitled "Executive, Administrative, Professional * * * Outside Salesman, Redefined." Referring to requirements of Section 541.2 of the Regulations as to "Administrative Assistants" and "Staff Employees," it is stated:

"In modern industrial practice there has been a steady and increasing use of persons who assist an executive in the performance of his duties without themselves having

executive authority. Typical titles of persons in this group are executive assistant to the president, confidential assistant, executive secretary, assistant to the general manager, and administrative assistant. It may be noted that such positions have counterparts in Government service.

"Generally speaking, such assistants are found in large establishments where the official assisted has duties of such scope and which require so much attention that the work of personal scrutiny, correspondence, and interviews must be delegated. However, it is clear that without adequate safeguards the claim should be made that not only the executive secretary but also the special messenger, for example, is an assistant to the general manager. It is, therefore, specified in this subsection of the Regulations that the assistance 'requires the exercise of discretion and independent judgment.' This in itself will assist in drawing a line between the stenographer whose task is primarily mechanical in nature and the true executive secretary who, although she may take some dictation and do some typing, is primarily employed because of her ability to distinguish between callers at the office and to carry out other special and important duties. The further requirement of a salary limit should effectively prevent abuse.

"Employees exempted by the second alternative in the definition are those who can be described as staff rather than line employees, or as functional rather than departmental heads. They include employees who act as advisory specialists to the management; many of them in the higher brackets are commonly described as consultants. Their advice is, of course, directly related to management policies. There is likely to be some overlapping between these employees and professional employees as in the case of legal advisors. Typical examples are such persons as tax experts, insurance experts, sales research experts, wage rate analysts, investment consultants, foreign exchange consultants, and statisticians.

"Also included in this group are persons who are in charge of a so-called functional department, which may frequently be a one-man department. The work of these employees is directly related to general business operations. Typical examples are such employees as bank tellers, credit managers, purchasing agents, buyers, safety directors, personnel directors, and labor relations directors. Employees of this type

in the higher brackets habitually establish procedures and assist in the determination of policies which must be followed by all the employees of the employer. They can, therefore, when given authority, be of great importance in the successful operation of their employer's business. However, although they are in charge of departments, they frequently have no employees under their supervision and therefore are not eligible for exemption as 'executive' employees. Furthermore, there is an imperceptible gradation in responsibility and authority up and down the line. Here, as in the other instances, the differentiation between the clerk and the person with true administrative responsibility is to be found, first, in the exercise of discretion and independent judgment, and, second, in the receipt of an appropriate salary."

█ A careful consideration and analysis of the record before us has convinced us that the plaintiff in this action definitely and clearly falls within the category of an administrative assistant or employee during the period from April 24, 1942, to the termination of his services with the defendant corporation June 26, 1943.

Mr. Gorchakoff is a graduate of Occidental College in Los Angeles, with an earned A. B. degree in business administration and economics. Upon graduation he began work as an employee of the Union Oil Company in the personnel department, interviewing applicants for "jobs" at different units of the oil company, and later, because of the "Depression" he did manual work in a substation and in a warehouse of the Union Oil Company. He next became "sports director" of the Ambassador Hotel in Los Angeles, and in this position he had a shop of his own, where he carried on the sports equipment business and also arranged tennis tournaments in collaboration with the various department heads in the hotel company. He next became manager of the Beverly Hills Tennis Club, where he had charge of the recreational facilities and of the operating personnel consisting of a secretary-bookkeeper and a locker room attendant. In these two activities he contacted manufacturers of sports equipment and dealt in merchandise used in the facilities of which he was the manager. Thereafter Mr. Gorchakoff became a managing partner in an employment agency business.

With the aforesaid educational and business background plaintiff entered the ser-

vice of the defendant company as employee relations officer under the immediate supervision of the employee relations manager. Mr. Gorchakoff's primary assignment in the defendant company was supervisor of the Selective Service activities of the shipbuilding company. He had a private office and a staff of five or six assistants, including a secretary, an interviewer, and several typist-clerks. The magnitude and importance of this functional unit of the shipbuilding company is reflected by the increase of the employees of the shipyard during the time of plaintiff's position as Selective Service supervisor from about 5800 to at least 35,-000. The evidence shows that most of the foremen, lead men and superintendents in the shipyards were requesting deferments from military service of the employees in their groups and the procedure in all such cases brought the matters before the plaintiff for processing. This duty required Mr. Gorchakoff to acquire a thorough knowledge of the Selective Service regulations and in performance of his duties to the defendant to effectively employ such knowledge in preparing the material required by the official forms and documents submitted to the draft agencies under the Selective Service system. He carried on the correspondence between the Selective Service agencies relating to deferment problems of the shipyard workers, advised superintendents and others of what the draft regulations were and of rights and privileges under them. He acted in the capacity of a coordinator of all Selective Service matters.

Mr. Gorchakoff appeared before Draft officials and boards and presented the cases of the shipyard employees for occupational deferment. The only matter in connection with the Selective Service classification of the workers of defendant corporation that was not attended to under direction and supervision by Mr. Gorchakoff on behalf of the corporation was the actual signing of the so-called verified deferment request form 42–A, which signing was done by the Employee Relations Manager, who was Mr. Gorchakoff's immediate superior in the defendant organization. The evidence shows, however, that all of the factual data that went into the deferment requests was developed and assembled by the plaintiff, and that in the formal affidavits requesting deferments of workers the manager, Mr. Burton, because of plaintiff's greater familiarity with Selective Service regulations, generally accepted the classification material as prepared and effectually arranged in the appropriate forms by plaintiff for the Draft agencies consideration.

While the plaintiff's principal duties pertained to the defendant's critical Selective Service matters, he, on account of his experience in sports activities, assisted the recreational supervisor as a consultant and coordinator, and in such capacity Mr. Gorchakoff designed and drew up certain suggested ideas in connection with the recreational program of the defendant shipbuilding corporation. And while his management of the "Cal-Ship Club" was outside the scope of his duties involved in this action, his selection for this position does indicate to some extent the administrative qualities of his work with the defendant.

Upon reentering the defendant's employ December 15, 1942, he was again assigned to the Employee Relations Department under the supervision to the same man with whom he had worked prior to going to "Cal-Ship Club." His assignment and duties are generally stated by the witness Burton as follows:

"His principal job duties that period were as supervisor of the manpower utilization section which was set up. He was instructed to take over this work, to delve into it, and to become thoroughly acquainted with it, and to do the job that had to be done, and subsequently he assisted with some other matters in recreation and "Cal-Ship Club" matters, and other assignments. * * * Because of his background in handling the various affairs of Selective Service, because of his knowledge at the yard and his length of service and acquaintanceship with all of the people within the organization, particularly the supervisory people, why, we felt that he would be qualified to do this job. And it was somewhat on that basis that the selection was made, and none of us knew particularly what was to be done on that. * * *. He had to interpret to the supervisory heads this whole procedure that was involved and all that was involved. In other words it was a question of supplying information to the supervisory people througout the plant and then as—and to tell them, and he set up for them forms to have them submit all of this information, and they, in turn, submitted that to Mr. Gorchakoff, and he turned it over and assigned it to his various staff people, and it was posted on these forms. * * *. I didn't have too much personal contact with this whole manpower utilization program because of the fact I

had so many other things to look after, and I virtually dumped the whole thing in Mr. Gorchakoff's lap and let him run it."

The Manpower Utilization section was a new major key unit in the shipyards. It was established to meet requirements of the Selective Service System that an orderly replacement schedule be made operative in the wartime activities of the defendant corporation.

In order that this all-important plan to safeguard both military demands and production necessities be supplied, Mr. Gorchakoff was specially assigned to supervise the actual work of gathering and preparing the statistical material and colating it for final entry upon forms approved by the War Manpower Commission, known as the "Manning Tables" and replacement schedules.

Plaintiff's contention that his work did not involve the exercise of discretion and independent judgment and that all that he did was to see that information and forecasts obtained by him from superintendents was literally incorporated into the appropriate forms does not accord with the record before us. On the contrary, the evidence clearly shows that throughout the applicable period the plaintiff in order to keep abreast of the requirements of the affected agencies of the Government contacted them continuously as the representative of the defendant corporation, attended classes of instruction for the purpose of a better understanding of the problems of his position as supervisor of the Manpower Utilization Section, and checked with the supervisory heads, pointing out to them wherein the information submitted by them was out of line with Regulations and even changing the information received from superintendents where such information was not in conformity to the regulations prescribed by Governmental authority.

In his position as supervisor of the War Manpower Utilization Section plaintiff oversaw the work of his several assistants who did the actual clerical work in preparing the necessary tables to effectuate the work of the new War Manpower requirements. He had a private office and a secretary. At intervals and as incidental to his main assignment and duties he performed some clerical work, but as compared with his managerial and supervisorial duties his clerical or manual activities were relatively unimportant and negligible.

Subsequent to the completion of the work on the "Manning Tables" and replacement schedules, plaintiff devoted some of his time to developing a new recreational program for the employees of the defendant.

The character and importance of the plaintiff's work during the entire period of time involved in this action is well and accurately described by his immediate superior in these words: "He was a righthand man right from the day he came."

We conclude that plaintiff during the two periods while on the exempt payroll at a monthly salary was employed in an administrative capacity within the Administrator's definitions and was during such times exempt from the provisions of the Act. It follows from this conclusion that it is unnecessary to discuss or determine the method of compensation argued by respective counsel in their briefs.

Findings of fact, conclusions of law and judgment are ordered under the issues of the complaint and answer pursuant to the views expressed in this memorandum of decision for plaintiff in the sum of $145.59, and an additional equal amount as liquidated damages, and in the further sum of $250 as a reasonable attorney's fee herein.

Upon the issues of the second and third affirmative defenses of the answer, findings of fact, conclusions of law and judgment are ordered for defendant.

The attorneys will collaborate, prepare and present under the rules of court appropriate findings of fact, conclusions of law and judgment in accordance with the foregoing within ten days from notice hereof.