## LYNCH et al. v. EMBRY–RIDDLE CO.

### Civ. No. 967–M.

District Court, S. D. Florida, Miami Division.

Dec. 27, 1945.

Robert M. Thomson, of Miami, Fla., and Russell M. Yates, of Miami Beach, Fla., for plaintiffs.

McKay, Dixon & DeJarnette, of Miami, Fla., for defendant.

HOLLAND, District Judge.

This complaint was filed by R. O. Lynch and certain other named plaintiffs, under the Fair Labor Standards Act of 1938, Sections 6, 7 and 16, 29 U.S.C.A. §§ 206, 207 and 216. From time to time other plaintiffs were allowed to intervene. The defendant has answered. Testimony has been taken on the question of liability. On this issue the case has been argued and taken under advisement.

### Findings of Fact

1. The defendant, for the period from July 1, 1942, to December 31, 1943, was a Florida corporation, with places of business in Dade County and other places in the State of Florida. Among these places of business was one at N. W. 27th Avenue and 32nd Street in the City of Miami, Florida. This is referred to in the record variously as the old Fritz Hotel, the Tech School and the Engine Overhaul. Another was located at Northwest 8th Avenue and 20th Street in Miami, and is referred to sometimes as the Aircraft Overhaul, or just 20th Street.

2. The plaintiffs (with the exception of the plaintiff Snow) were employed by the defendant either in Engine Overhaul or Aircraft Overhaul. Snow was an accountant in the general office of the defendant. The plaintiffs are suing for overtime compensation, liquidated damages, and attorneys' fees under the Fair Labor Standards Act.

3. During the period indicated in Finding No. 1 the defendant operated several flying schools where instruction was given to air cadets as a part of the military training program. However, none of the plaintiffs (except possibly Snow) were connected with this activity of the defendant, and the Court is, as to the other plaintiffs, who are numerous, not concerned with the school activities in this suit.

4. During the period indicated, the defendant operated at Engine Overhaul a machine shop in which aircraft engines and their component parts, such as carburetors and propellers, were overhauled and repaired. The exact number of engines is not disclosed by the evidence, but it was somewhere close to 4000 engines. Of this number, about 15 were overhauled for private persons, other than the defendant, and some

were owned by the defendant and used by it in its flying schools. The vast majority, however, were the property of the United States or its departments or agencies. One belonged to Rubber Development Corporation, a Federal corporation wholly owned by the Government.

5. At Aircraft Overhaul similarly owned airplane wings, fuselages, and tail assemblies were worked on by the defendant in a shop equipped for this work.

6. As to the privately owned planes and component parts thereof, the evidence shows that all of them were delivered to the defendant in Dade County, Florida, for overhaul, that the work was done in Dade County, and that delivery was made of the overhauled plane or part to the owner in Dade County, Florida. Of the new parts and material used by the defendant in this work, some was purchased by the defendant from manufacturers or dealers outside the State, and some was purchased from dealers within the State. No sales or planes or components thereof, or new parts, are shown to have been made by the defendant.

7. The procedure for the overhaul of the Army planes, engines or other components is fully outlined by the evidence.

(a) On July 21, 1942, the Army Air Force established a sub-depot, under the command of Captain Francis P. Bacon, upon the grounds of the defendant's place of business.

(b) To this sub-depot various Army Airfields or Training Commands in the southeastern area of the United States shipped planes, engines, wings or other component parts in need of overhaul. Various methods of transportation were used. In all cases the consignor would be the Army Air Forces or some detachment thereof, and the consignee would be the sub-depot of the Army Air Force.

(c) This Air Force sub-depot maintained two stockrooms for storage or parts, and two warehouses or storerooms for storage of engines and other components. When aircraft components were received by the sub-depot, they were taken off the Army accountability records of the shipping detachment, and went on the accountability records of the sub-depot.

(d) In most instances these new parts were obtained by the sub-depot through the regular procurement channels of the Army. It is probable that most of the parts were manufactured outside the State of Florida.

(e) In some instances (described by Captain Bacon as a "limited extent", and by others as "rare" or "very small") new parts were supplied by the defendant in accordance with procedure outlined in a written memorandum issued by Captain Bacon. This procedure was applicable only in an emergency, such as the inability to obtain the part through Air Force channels, and required that the parts so procured should be turned in by the defendant to the Air Force stockroom and reissued, as hereafter described, to the defendant in the same manner as parts procured through Air Force channels. The defendant was reimbursed for such parts at cost plus a handling charge. Before the defendant was permitted to procure parts in this fashion, it had to receive specific written authority so to do from the commanding officer of the sub-depot.

(f) When a plane, engine or other aircraft component was proposed to be overhauled, the defendant made a preliminary inspection thereof and submitted a proposal showing the number of hours of work involved, and the price for the work. Sometimes these proposals were accepted by the Air Force, but frequently they were rejected. If the proposal was rejected, the component was returned to the sub-depot.

(g) If the proposal was accepted the defendant received a "work order" on an Army form, describing the work to be done. The defendant also gave the sub-depot a receipt (also on Army form) for the article to be overhauled. The plane component was then disassembled and inspected by both inspectors for the defendant and for the Army.

(h) Parts found to be usable were tagged with an Army form indicating this fact. Parts found to be non-usable were tagged with an Army form indicating this fact and returned by the defendant to the sub-depot, which gave the defendant an Army form receipt therefor. If new parts were needed, such parts were issued to the defendant by the sub-depot, and receipted for by the defendant on an Army form. If a whole new unit had to be replaced by a later model, the old one was turned into the sub-depot and a new one issued by it, the transaction being recorded on still another Army form. All work was conducted under the inspection of Civil Service employees of the Army.

(i) After the necessary overhaul had been made and the work finally inspected

and approved by the Civil Service employees of the Army mentioned above, it was returned to the Army sub-depot which issued a receipt to the defendant for the overhauled article.

(j) The defendant was not equipped to perform some of the operations which were necessary upon the airplane components to be overhauled, and in such instances the Army sub-depot delivered the articles to be overhauled in the way in which the defendant could not do so to other machine shops having the facilities to do the work, which in turn by the same procedure followed by the defendant, returned the overhauled articles to the Army sub-depot.

8. The plane engine or other component was not usually returned to the same airfield or training command which had shipped it to the Army sub-depot in Miami. Such overhauled components were shipped by the sub-depot as consignor to whatever point which might requisition such article through the usual Army airforce channels.

9. In many cases the Army paper work authorizing the transfer of the article to be overhauled would pass from an airfield in the State of Florida to the Army command at Warner-Robbins Field in Georgia, and from there to the sub-depot maintained by the Army airforce upon the property of the defendant, although the physical movement of the aircraft component to be overhauled would be directly from a point within the State of Florida to the sub-depot in Miami.

10. During a portion of the time during which the defendant was conducting these overhaul operations, the airplane component on which overhaul had been completed by the defendant was stored in one of the two storehouses maintained by the sub-depot as above mentioned. Toward the latter part of the operations conducted by the defendant the Army's need for these overhauled components was so great that trucking companies and other means of transportation picked up the completed articles for shipment without these articles being placed into the storeroom. However, it appears that the Army sub-depot was maintained until approximately six months after December 31, 1943, and it is not clear whether this latter period refers to this six months period or some period of time prior thereto.

11. The Court takes judicial knowledge of the fact that the overhaul operations conducted in the defendant's machine shops did not begin until after the United States had entered the War. The Court also takes judicial knowledge of the fact that during the War private flying and the use of planes by private persons was so materially limited that there was very little overhaul work to be done by anyone engaged in this line of business, but nevertheless the defendant did on occasions perform this type of work from time to time for the general public. The defendant will be allowed to amend its answer in this respect so as to conform with the evidence.

Contentions of Parties

The plaintiffs and intervenors contend:

a. That aircraft and component parts owned by the Government moving across State lines as a part of operations necessary to the conduct of the War constitutes interstate commerce within the meaning of the Fair Labor Standards Act.

b. That the plaintiffs and intervenors were engaged in the production of goods for such commerce.

The defendant contends on the other hand:

a. That the movement across State lines of aircraft being used by the Government in the prosecution of the War does not constitute commerce within the meaning of the Fair Labor Standards Act.

b. That while the plaintiffs and intervenors may have been engaged in "production" as defined in the Fair Labor Standards Act, the goods upon which they were working are not goods of the type defined in the Fair Labor Standards Act, but on the other hand were goods in the hands of the ultimate consumer, to-wit, the Government, in the prosecution of the War.

c. That the defendant falls within the exemption of a service establishment as specified in Section 13 of the Fair Labor Standards Act, 29 U.S.C.A. § 213.

d. That even though this Court should determine that the movement of property owned by the Government and used by it in the prosecution of the War across State lines constitutes commerce, the interstate movement terminated when the aircraft components in question came into the hands of the Army Air Force's sub-depot in Miami, Florida, and that further interstate movement did not begin until after the overhauled articles had been returned to this sub-depot in Miami, Florida.

e. That due to the fact that it was the exception rather than the rule for an aircraft component which had come from a point outside the State of Florida to the Army sub-depot to be returned to a point outside the State of Florida, there was no continuous flow of interstate movement of such aircraft components which would make the process of interstate movement continuous.

### Conclusions of Law

1. The plaintiffs, engaged as they were in the repair of the motor engines, and parts, for the United States Government, were not engaged in commerce. This is clear from the evidence, and as I understand counsel for the plaintiffs they do not so contend. The next inquiry is as to whether, engaged as they were in such repair work, they did engage in the production of goods for commerce. See Sec. 2(a) of the Act, 29 U.S.C.A. § 202(a). The word "repair" implies the doing of work again, or redoing some work found defective, or which has become defective with use and in need of doing over again, the extent of which either as a large or small job of repairing, being unimportant. I think the word "repair" should be given its usual normal meaning, and I hold that "repairs" made by the plaintiffs constituted "production" in the sense that word is defined in the Statute. A proper application of the defined word "goods" is the crux of this case. The major work in which these plaintiffs were engaged was the repairing of engines, and their parts. Some new parts were naturally installed on the repaired engines, but basically and essentially the work which the defendant was performing for the Government, and in which these plaintiffs were engaged, was that of repairing, and these engines had been theretofore delivered to and in the physical possession of the Government, and had been theretofore committed to the use of and by the Government as the ultimate consumer. I conclude and find that the industry in which these plaintiffs were engaged was not the production of goods for commerce. The plaintiffs rely upon two cases as precedents for their contention to the contrary: Umthun v. Day & Zimmerman, Inc., Iowa, 16 N.W.2d 258, and Timberlake v. Day & Zimmerman, Inc., D.C., 49 F.Supp. 28.

The distinction between the cited cases and the case at bar lies not in a distinction between "repairing" and "processing", but in the difference in point of time at which, and attending circumstances under which, the Government came into complete physical possession of the finished products as the ultimate consumer. In the Timberlake case (and I use that for comparison) the Government furnished the metal parts for the loading of the shells, but defendants furnished explosives manufactured by it, and did all the processing, before there was any complete delivery of the finished product to the Government, and the work Timberlake and his coplaintiffs performed was in producing goods for commerce before complete delivery to the Government as ultimate consumer. In the case at bar the reverse is altogether true.

In coming to this conclusion, the thought naturally arises as to whether a large scale repairing of airplane engines and parts for the Government gives rise to a conception of this repair work as being a new production of goods. Under the statute such repairing considered as a new production cannot be considered as a new production of "goods" because the Government has theretofore become the consumer with actual use of the engines, with full delivery having, of course, theretofore been made, and such repairing for the Government, the consumer, does not constitute the producing of "goods" for commerce, as the word "goods" is defined in the Act. The defendant contends that such repairing should be considered a servicing under Section 13 of the Act, but I cannot hold with the defendant in this reasoning. Neither can I hold with the witness Tisdale as to his reasons for a decision reached administratively.

2. While the power of Congress to extend its control over all forms of interstate movement of property cannot be doubted, Congress has not seen fit in the Fair Labor Standards Act to exercise the power so to do to the extent to which it might have exercised it. One of the areas carved out or exempted from the operation of the power which Congress might have exercised but did not, is that of work upon goods after such goods have come into the hands of the ultimate consumer. In this case it is quite clear that the planes and component parts thereof upon which the defendant worked were in the hands of the ultimate consumer, to-wit, the Federal Government, while engaged in the prosecution of the War. The Government in using these planes, both before and after the overhaul operations thereof, conducted by the defendant, was the ultimate consumer thereof,

and the Government in using the planes in the prosecution of the War for the training of pilots was not a producer, manufacturer or processor thereof.

■ 3. The mere receipt by the defendant of parts from outside the State of Florida for use in its overhaul operations is not sufficient to bring the defendant within the coverage of the Fair Labor Standards Act.