**ST. JOHNS RIVER SHIPBUILDING CO.**
**v. ADAMS et al.**

No. 12000.

Circuit Court of Appeals, Fifth Circuit.

Dec. 12, 1947.

WALLER and HUTCHESON, Circuit Judges, dissenting in part.

Walter F. Rogers and Francis D. Wheeler, both of Jacksonville, Fla., for appellant.

J. Ollie Edmunds and Alston Cockrell, both of Jacksonville, Fla., for appellees.

Before SIBLEY, HUTCHESON, HOLMES, McCORD, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

R. A. Adams, an employee of St. Johns River Shipbuilding Company, brought suit for himself and others similarly situated for time and a half pay for hours worked in excess of forty hours per week between January 1, 1942, and July 31, 1945, plus liquidated damages and attorneys fee, by virtue of the Fair Labor Standards Act. Other employees intervened, a trial was had, and judgment was given in favor of the plaintiffs who were "expediters" and "sergeants of the guard," on a holding that they were not excepted from the Act as administrative or executive employees; but against the editor of a plant magazine, on a holding that he was an administrative employee and not within the Act. The Company alone appeals.

Since the trial the so-called Portal-to-Portal Act has been passed, 61 Stat. 84, 29 U.S.C.A. § 251 et seq. It appears to have a bearing upon the question of limitation raised in the case (See McCloskey & Co. v. Eckart, 5 Cir., 164 F.2d 257); and also on the question whether under Section 9 thereof the Company is excused because in fixing and paying the salaries of plaintiff and intervenors without reference to overtime it acted in good faith "in reliance on administrative regulation, order, ruling, approval or interpretation of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employees to which he belonged." The Company asserts and offered evidence to show that these employees were classified and their salaries fixed in cooperation with the United States Maritime Commission, the National Labor Relations Board, and the Salary Stabilization Unit of the Bureau of Internal Revenue.* The precise things done or relied on have not been shown or adjudged, nor whether they fall within the intent of Section 9. The general finding of the district court that the Company acted in good faith in the matter of salary payments was made before and without reference to the Portal-to-Portal Act and is not a sufficient basis for us to direct the dismissal of the claims, as we have been moved to do by the Company. The alternative motion that the judgment be set aside and the case be remanded for reexamination under the new legislation we will grant. Carpenter v. Wabash Railway Co., 309 U.S. 23, 27, 60 S.Ct. 416, 84 L.Ed. 558; Alaska Juneau Gold Mining Co. v. Robertson, 331 U.S. 793, 67 S.Ct. 1728; 149 Madison Ave. Corp. v. Asselta, 331 U.S. 795, 67 S.Ct. 1726.

We might here leave the case; but since the question whether the plaintiffs were employed in "producing goods for commerce" (which is their sole claim for the application to them of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.) has been fully investigated in the district court and argued before us, we will decide it for the further guidance of that court.

This Company is a private corporation organized in March, 1942, for the sole purpose of entering into contracts with the United States Maritime Commission to construct for the United States a shipyard at Jacksonville, Florida, and to build ships there, using the shipyard without rent. The construction and first shipbuilding contracts were made on March 4, 1942. Thirty "Liberty Ships" were to be completed and turned over to the Commission between Dec. 15, 1942 and Dec. 31, 1943. The shipyard, all tools and material were the property of the United States, as were the ves-

---

* Section 201 of the First War Powers Act, 55 Stat. 839, 50 U.S.C.A.Appendix, § 611, gave the President broad powers to authorize "any department or agency of the Government exercising functions in connection with the prosecution of the war effort, in accordance with regulations" to be made by him, to enter into contracts, etc. Pursuant thereto Executive Order No. 9001, of Dec. 27, 1941, 50 U.S.C.A.Appendix, § 611 note, was made relating to the Maritime Commission, and authorizing it to act through "any other officer or officers or civilian officials of the * * * United States Maritime Commission", who in turn might make further delegation of their powers. This may have a bearing in considering the authority of persons with whom the Company dealt.

sels at all times, from keel to rigging. The work was all on a cost-plus-variable-fee basis, the variation resting on promptness in executing the work. Most of the material was bought by the government and shipped in. Pay rolls were paid by the Company, but reimbursed weekly. Considerable oversight and direction of work and employees was exercised by government officials. The first ship contract was followed by the second on April 23, 1943, for 52 more Liberty Ships to be finished between February 10, 1944, and December 29, 1944. Lastly, on July 26, 1944, a contract was made to build twelve tankers of a different design, to be finished between March 8, 1945, and May 6, 1945. The last Liberty Ship was turned over to the Commission February 24, 1945, and the last tanker on September 28, 1945. The Company then ceased operations, except to guard the shipyard.

■ Many circumstances tend to indicate that the Company was itself an agent or agency of the United States, but all its contracts expressly state that it was to act not as agent, but as an independent contractor. Its treasurer testifies this to be his understanding; many other circumstances support that view, and the Company makes no contrary contention before us. So assuming, the plaintiffs are the Company's employees and not employees of the United States, and may be under the Fair Labor Standards Act if producing goods for commerce. None claims to have been engaged in commerce. The petition alleges the Company was engaged in commerce, but it is well settled that not the employer's business, but the employee's work, is what counts. So says the Act, Sect. 7, 29 U.S.C.A. § 207. Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

■ These employees were found to be employed in building ships and doing work essential to that end. Ships are by the definition of the statute included among "goods." Sect. 3(i), 29 U.S.C.A. § 203(i). Ships which are to be used as vehicles of interstate and foreign transportation are fairly "goods for commerce," for the statute, Sect. 3(b), and the Constitution include transportation as commerce. There would be no difficulty save for the fact of war, declared in December, 1941. Yet war does not stop all commerce nor suspend the laws regulating commerce. Goods, including ships, may still be produced for commerce, and we think the Liberty Ships were so produced. The Maritime Commission, normally a peace time agency, made the contracts for these, the contracts reciting as their authority Act No. 247, Aug. 25, 1941, of the 77th Congress, 55 Stat. 669, 681, authorizing it to contract for "merchant vessels of such type, size, and speed as [it] may determine to be useful for carrying on the commerce of the United States and suitable for conversion into naval or military auxiliaries." The contracts state that the vessels ordered are such vessels. The evidence shows no different purpose in producing them. The Interpretive Bulletin No. 5 of the Wage and Hour Division of the Department of Labor issued in December 1938, revised November, 1939, state: "Employees are engaged in the production of goods for commerce where the employer intends or hopes or has reason to believe that the goods or any unsegregated portion of them will move in interstate commerce. * * * The facts at the time the goods are being produced determine whether an employee is engaged in the production of goods for commerce, and not any subsequent act of his employer, or some third party." Thus the agreed purpose of these ships was primarily commerce, with only a possibility of utilizing them later for war. As the intentions of the owner and builder stood at the time of construction they appear to have been ships produced for commerce.

■ The tanker contract is different. The Maritime Commission there recites as its Congressional authority Act No. 70 of the 78th Congress, approved June 14, 1943, 57 Stat. 151, and Presidential action directing the construction of vessels of the type described in the contract. The defense of the United States is the theme of this Act, and of that which it supplements, Act March 11, 1941, 55 Stat. 31, 22 U.S.C.A. § 411 et seq.; and commerce is not mentioned. The evidence is that these tankers were of relatively small size, intended to be used in the fighting in the Pacific in hopping from island to island, to carry fuel from the naval bases to the naval vessels and the soldiers at the fighting front. They were not fitted ·

out and equipped as commercial vessels would have to be to obtain a certificate from the Coast Guard, having 45 defects, including want of proper quarters for crews, and equipment for safety, so that only crews from the navy could operate them under a special permit. They were turned over directly to the navy at the Company's dock. They became "expendibles" at the battle front. They were goods produced for war, not for commerce. War is not commerce. There can be commerce in war equipment, but when the government itself in the midst of war has produced for immediate use in war at its own expense and in its own shipyard special type vessels as auxiliaries for its navy and to be manned by navy crews, commerce is not involved at all. The Company and its employees knew it was not. The war power of the federal government is its supreme power. When it is in action it is transcendent. This work was not the time and place to bicker about overtime. The men who manned these boats got no overtime. They staked and often lost their lives.

■ There is evidence that these tankers can be altered for business use. But it is also testified that not one has found a purchaser since the fighting ceased. It remains true that at the time they were produced they were for war and not commerce. What may possibly be done with them in the future is irrelevant. Work done on these tankers is not under this Act.

The second Liberty Ship contract, and the tanker contract, in Article 20 of each, declare that the Act of Oct. 10, 1940, No. 831 of the 76th Congress, 54 Stat. 1092, 40 U.S.C.A. § 326 note, applies to this contract. No notice of this Act seems to have been taken in the court below, nor in the argument here, but unless repealed it may be of importance. It applies only to contracts of the Maritime Commission, and during the period of emergency, but it seems to suspend, as to these contracts, overtime laws and to substitute a basis of its own for the benefit only of laborers and mechanics. No liquidated damages or attorneys fees are included. We intend to express no opinion about this Act, but only to call attention to it.

The judgment is reversed and the cause remanded to the district court for further proceedings consistent with this opinion.

Reversed.

WALLER, Circuit Judge (concurring in part and dissenting in part).

I concur with such parts of the main opinion as hold that the liberty ships were produced for commerce. I concur, also, in the conclusion that under the Portal-to-Portal Pay Act of 1947, Chapter 52, Public Law 49—enacted since this case was decided by the lower Court—the judgment should be reversed in order that the lower Court may consider the case in the light of that Act.

I do not, however, concur in the conclusion that the production of tankers was not within the scope of the term "production of goods for commerce."

"Commerce" was defined by the Fair Labor Standards Act, 29 U.S.C.A. § 203 (b), among other things, as " * * * transportation * * * among the several States or from any State to any place outside thereof." Subsection (i) defines "goods" in connection with the production of goods for commerce as "including ships and marine equipment."

These tankers were "goods" produced for "transportation," and since the lower Court found that "Without altering the fundamental design of the vessel, however, and with certain modifications pertaining largely to safety, the crew's living quarters, the removal of guns, etc., they are readily adaptable to civilian purposes for transporting fuel oils" [D.C., 69 F.Supp. 989, text, 991.], we are not justified in holding, contrary to the finding of the lower Court, that the production of these tankers was unattended by the hope, expectation, or belief that upon the cessation of war some of the surviving of these vessels would, no doubt, become instrumentalities of interstate and foreign transportation of fuel oil.

I think that the conclusion of the lower Court in respect to the tankers was also correct.

HUTCHESON, Circuit Judge (concurring in part and in part dissenting).

As my brother Waller has done, I concur in part and dissent in part from the opinion in this case. In addition to the reasons he gives for his dissent, I add the broader ground of my dissent in Kennedy v. Silas Mason Co., 5 Cir., 164 F.2d 1016.