### REED et al. v. MURPHEY et al.

#### No. 12173.

Circuit Court of Appeals, Fifth Circuit.

April 7, 1948.

Rehearing Denied June 9, 1948.

---

Sherwood W. Wise, of Jackson, Miss., and Charles S. Corben, of Washington, D. C., for appellants.

R. W. Thompson, Jr., Bidwell Adam, and English Lindsey, all of Gulfport, Miss., for appellees.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

This action was brought by 121 named plaintiffs and two interveners against M. T. Reed and · others, a copartnership doing business as M. T. Reed Construction Com-

pany, to recover overtime, liquidated damages, and attorneys' fees alleged to be due under Section 16(b) of the Fair Labor Standards Act of 1938. 52 Stat. 1069, 29 U.S.C.A. § 216(b).

The contest stems from work performed by plaintiffs for defendants during the war when defendants were engaged, under two cost-plus-a-fixed-fee contracts with the United States Government, in the original construction, and subsequent maintenance and operation, of a Naval training camp and a Naval Advance Base Depot at Gulfport, Mississippi.

The question presented is whether any or all of these plaintiffs, during the term of their employment, were engaged in commerce, or in the production of goods for commerce, within the meaning and coverage of the Fair Labor Standards Act.

The case was tried by the court without a jury upon (1) a stipulation that the defendants' request for admissions of fact and the plaintiffs' reply thereto should constitute the factual proof, and (2) the testimony of one witness for plaintiffs. The court held that 117 of the plaintiffs and interveners involved were engaged in commerce and therefore entitled to benefits under the Act. Judgment was accordingly entered for these plaintiffs in amounts aggregating $153,493.95 as overtime compensation, liquidated damages, and attorneys' fees.

We have dredged up from the record, which is in many respects vague and uncertain, the important and material facts upon which decision must turn.

During World War II, in 1942, the Chief of the Bureau of Yards and Docks of the Navy Department, as a part of the government defense program, entered into two cost-plus-a-fixed-fee contracts with the defendants to facilitate the prosecution of the war.[1] The first of these contracts was for construction of a Navy camp for training Construction Battalions, commonly termed "Seabees", and a Naval Advance Base Depot at Gulfport, Mississippi; the second

---

[1] These contracts were entered into under the authority of the First War Powers Act, of December 18, 1941, c. 593, 55 Stat. 838, 50 U.S.C.A.Appendix, § 601 et seq., the Naval Appropriations Act of 1943, Public Law 441, 77th Congress, 2d Sess., 56 Stat. 54, and the Sixth Supplemental National Defense Appropriations Act of 1942, April 28, 1942, c. 247, 56 Stat. 226.

contract was for maintenance and operation of the Advance Base Depot.

The defendants, in the performance of these two contracts, maintained separate and distinct organizations. Employees working under the construction contract were designated "construction" workers, and carried on the "construction" payroll, while employees working under the maintenance and operation contract were known as "maintenance and operation" or "M & O" employees, and carried on the "M & O" payroll, which was entirely separate and distinct from the "construction" payroll.

The defendants and their employees commenced work under the construction contract the latter part of April, 1942. They built warehouses, buildings, barracks, mess halls, railroad spurs, a recreation hall, a laundry and other installations appropriate for Navy encampments. In addition, they constructed a rifle range and an ammunition storage depot 25 miles north of Gulfport. Actual construction in the field was begun about May 15, 1942, and was completed April 6, 1943. Approximately 5,000 employees were engaged in construction work under this contract during the peak period. Construction materials for the project were obtained from both local and out-of-state sources. Approximately 40 per cent of the dollar value of purchase orders was issued to out-of-state vendors.

A number of plaintiffs employed under the construction contract worked as guards, timekeepers, material checkers, engineers, draftsmen, rodmen, building inspectors, blue-print machine operators, paymasters, accountants, stenographers, clerks, lumber expediters, purchasing agent, superintendent of motor pool, chauffeur and firemen. Some plaintiffs worked at several jobs in the course of their employment. The guards performed custodial duties at various posts throughout the construction area. The timekeepers kept time records of construction workers, including carpenters, concrete and steel construction workers, bricklayers, plumbers, builders and mechanics. Several timekeepers kept time records of laborers, among others, who spent part of their time unloading interstate shipments. The material checkers received and checked the materials used in the construc-

tion work as to quantity and quality. The engineers, draftsmen, blue-print machine operators, building inspectors, and rodmen all performed various duties relating to the planning and construction of buildings and other installations at the project. The accountants, clerks, and other office personnel maintained payroll records of construction workers, prepared social security and withholding tax statements, made out vouchers and invoices covering construction materials, typed orders, maintained cost records and inventories, and performed other clerical and administrative duties incident to the construction activities.

Under the maintenance and operation or M & O contract, the defendants maintained and operated the Naval Advance Depot where materials and equipment were received from all parts of the United States for storage, assembly, and reshipment to "Seabee" Construction Battalions at advance bases in the various war theatres. Additional duties of the defendants under this contract included purchase, assembly, fabrication, testing, and preparation of materials and equipment for shipment to these advance bases overseas.

Nearly all the goods received at the Advance Base Depot were stored in one of the M & O warehouses or in open storage areas. The period of storage varied from a few days to several months. Incoming and outgoing shipments were of daily occurrence. Directions were received daily from Washington for the shipment of materials and equipment on hand to advance bases. All purchases were made on the basis and requirements of the Bureau of Yards and Docks, Navy Department, and defendants regularly received instructions from the Bureau regarding purchases to be made. Substantial quantities of goods were shipped on government bills of lading.

From the inception of the work under both the construction and the M & O contracts, it is without dispute that all of defendants' activities and operations were for the benefit of the Navy in its prosecution of the war; that the defendants cooperated closely with the Navy Department, and were at all times subject to the general supervision and control of the Naval-Officer-in-Charge.

The record discloses that of the 117 plaintiffs held entitled to recover, 89 were employed under the construction contract throughout their employment, 21 were construction employees during part, and M & O employees during the remainder, and 7 were M & O employees throughout their employment. Eleven plaintiffs were employed in an executive, administrative or professional capacity, and drew salaries of fifty dollars or more per week. Furthermore, several of the plaintiffs were classified as "Navy" employees during all or a part of their employment. These were carried on the defendants' payroll the same as other employees, but were hired, discharged, and performed all their work at the direction of, and solely under the supervision and control of the Naval-Officer-in-Charge, or the Navy Auditor.

If the Fair Labor Standards Act were the applicable criterion determinative of the issues in this case, we would have little hesitancy, in view of the undisputed record evidence, in concluding that these plaintiffs were not engaged in commerce or in activities so closely related to commerce as to be entitled to its protection. McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 87 L.Ed. 1538; Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Jacksonville Paper Co., 317 U. S. 564, 63 S.Ct. 332, 87 L.Ed. 460.

■ The 89 construction employees were shown to be engaged solely in local intrastate building activities throughout the term of their employment. It has been uniformly held that persons employed on such work are not "engaged in commerce or in the production of goods for commerce" within the meaning and coverage of the Fair Labor Standards Act. Parham v. Austin Co., 5 Cir., 158 F.2d 566; Phillips v. Graham Aviation Co., 5 Cir., 157 F.2d 443; Noonan v. Fruco Construction Co., 8 Cir., 140 F.2d 633; Soderberg v. S. Birch & Sons Construction Co., 9 Cir., 163 F.2d 37; Nieves v. Standard Dredging Corp., 1 Cir., 152 F.2d 719; Scott v. Ford, Bacon & Davis, Inc., D.C., 55 F.Supp. 982.

■ Plaintiffs have wholly failed to discharge their burden of proving that they, as distinguished from their employer, were engaged in commerce or production of goods for commerce, or that a substantial part of their activities were so closely related to commerce as to admit of coverage by the Act. Noonan v. Fruco Construction Co., 8 Cir., 140 F.2d 633; Soderberg v. S. Birch & Sons Construction Co., 9 Cir., 163 F.2d 37; Baloc v. Foley Bros., Inc., D.C., 68 F.Supp. 533; Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 87 L.Ed. 1538.

■ Moreover, if we should hold that the Fair Labor Standards Act was applicable here, we think it quite clear that eleven of these plaintiffs were within the executive, administrative, and professional exemptions established by Section 13(a) (1) of the Act. Gorchakoff v. California Shipbldg. Corp., D.C., 63 F.Supp. 309, 311; Peffer v. Federal Cartridge Corp., D.C., 63 F.Supp. 291, 292, 302; Smith v. Porter, 8 Cir., 143 F.2d 292, 296.

■ The "Navy" employees here involved manifestly do not come under the Act, since it is without dispute that they were hired, discharged, and working solely under the control and supervision of the Navy and its authorized representatives. Under such circumstances, these employees were working for the Navy Department and not for the defendants, notwithstanding their being paid in the same manner as other employees. Joseph M. Aiken v. Siems Spokane Co., et al.,[2] unreported, U.S. Dist. Ct., Washington, Western District, Northern Division, July 18, 1946; Lewis v. Virginia Engineering Co.,[3] D.C.E.D.Va., —— F.Supp. ——.

■ Furthermore, if we should follow through with the holding of the court and the judgment entered, it becomes apparent that the amounts awarded for overtime compensation and liquidated damages were erroneously computed at a regular hourly rate based upon a fictitious forty hour workweek, and that they were therefore excessive. Overnight Motor Company v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Landreth v. Ford, Bacon & Davis, Inc., 8 Cir., 147 F.2d 446, 448; Harring-

---

[2] No opinion for publication.

[3] Not yet released by court.

ton v. Empire Construction Co., D.C., 71 F.Supp. 324, 327. It further appears that liquidated damages have been shorn away by the Mississippi one-year statute of limitations. Section 731, Mississippi Code, 1942; Southern Package Corp. v. Walton, 196 Miss. 786, 18 So.2d 458; Cf. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Fidelity Union Trust Co. v. Field, 311 U.S. 169, 178, 61 S.Ct. 176, 85 L.Ed. 109. In any event, defendants are still entitled to assert any new defenses which may be created by the Portal-to-Portal Pay Act, if such exist. 29 U.S.C.A. § 251, et seq., 258; 149 Madison Ave. Corp. v. Asselta, 331 U.S. 795, 67 S.Ct. 1726; St. Johns River Shipbldg. Co. v. Adams, 5 Cir., 164 F.2d 1012; McCloskey & Co. v. Eckhart, 5 Cir., 164 F.2d 257.

Only portions of the two contracts in question are to be found in the record, and we are therefore unable to pass upon the question of whether the defendants here were independent contractors, or merely working as agents of the government. Furthermore, we have only adverted to what appear to be patent errors in the judgment, if the Fair Labor Standards Act is applicable.

We prefer to rest our decision on undisputed record evidence, which points unerringly to the fact that the work here performed, and the circumstances under which these goods and materials were purchased and delivered to the government during the war period, precludes these plaintiffs from recovering in this case.

The defendants and their employees constructed the Navy training camp and Advance Base Depot solely for the use of the government in its prosecution of the war. The materials and equipment used in the construction of the camp and depot belonged to the United States. All purchases of supplies and materials, of whatever character and description, were ordered by direction of the Navy Department, and became the property of the United States, as ultimate consumer, immediately upon delivery to the contractors, who in reality were purchasing for the government.[5] Thereafter, they were shipped overseas by the government, as the property of the government, for the sole purpose of supplying Seabee units in the various war theatres. Most of the materials, which included munitions, tools, clothing and other items sorely needed in connection with amphibious operations, were expendable. None were ever purchased or intended to be used for civilian consumption. All of these articles were needed by the Seabees at the battlefronts, to sustain them in the common fight, and they were therefore supplies of war.

■ Transportation by the government during war of government-owned munitions, or other essential war supplies and equipment, for the use of its armed forces, is not "commerce" within the purview of the Fair Labor Standards Act. Harris Kennedy v. Silas Mason Co., 5 Cir., 164 F.2d 1016. War is not commerce. There can be no commerce in war equipment. St. Johns River Shipbldg. Co. v. Adams, 5 Cir., 164 F.2d 1012.

■ We are of opinion that Congress did not intend, in passing the Fair Labor Standards Act, to include within its coverage war activities of a government cost-plus-a-fixed-fee contractor involving no peacetime competition and no marketing of goods in commerce. In thus construing the Congressional enactment, no just claims are thereby denied, or rights

4 In Harris Kennedy v. Silas Mason Co., 5 Cir., 164 F.2d 1016, having the *entire* contract there involved before us for consideration, we held that the close degree of supervision and control exercised by the government under that contract precluded the Mason Company from the status of an independent contractor, and made it merely an agent of the United States, excluded from the scope of the Act by Section 3(d) thereof. Here, only portions of the two cost-plus-a-fixed-fee contracts involved were stipulated into evidence.

5 The district court found that the title passed to the government "upon arrival at the Advance Base Depot". No finding is made as to where the title was during transit, and as no bill of lading is in the record, or other fact to support this finding, we think it more reasonable to conclude that the goods were shipped on an open bill of lading and became the property of the government when delivered by the manufacturer to the carrier.

violated. For other employees have undoubtedly already enjoyed the very benefits under the Act which these plaintiffs now seek. These goods were ordered by the defendants at the direction of the government from manufacturers and wholesalers from almost every section of the United States. No one denies that those employers engaged in manufacturing and delivering these articles for war use by the government were obeying, in their manufacture and delivery, the mandates of the Fair Labor Standards Act, and according their employees full benefits thereunder. But when these materials and supplies were sold and delivered to the United States, and thereby became the property of the United States as ultimate consumer,[6] they were irrevocably diverted from the stream of commerce, and assumed their character of essential war equipment.

We do not consider employees of a wartime cost-plus-a-fixed-fee contractor with the United States government, employed during a war in operations vital to the war effort, to be engaged in commerce or the production of goods for commerce so as to be entitled to benefits under the Fair Labor Standards Act. Barksdale v. Ford, Bacon & Davis, Inc., D.C., 70 F.Supp. 690; Lynch v. Embry-Riddle Co., D.C., 63 F.Supp. 992; Divins v. Hazeltine Electronics Corp., 2 Cir., 163 F.2d 100; Harris Kennedy v. Silas Mason Co., 5 Cir., 164 F.2d 1016; St. Johns River Shipbldg. Co. v. Adams, 5 Cir., 164 F.2d 1012.

It is obvious that the plaintiffs here knew they were engaged in helping to win the war. They were exempt from the draft, and the very life of the Nation depended upon their efficiency and haste in delivering these government-purchased and government-owned supplies of war to the Seabees on the fighting lines. Moreover, plaintiffs are not able to show any overtime service by independent recollection or by their own records, but rest their right of recovery on the files of the government and the hearsay evidence of an Auditor. They further bring this suit long after the war is over and their work has been consummated. It becomes patent, therefore, that this action to recover for overtime is an afterthought.

If these and like employees are to be paid the tremendous amounts they now seek, in overtime compensation, liquidated damages, and attorneys' fees, the entire cost of such a program must ultimately be borne by the government. We refuse to bleed the Nation white to provide financial windfalls for a protected few, at the expense of those many courageous "expendables" who fought and died on every battlefront to the end that this Republic might live.

The judgment is reversed and the cause remanded for proceedings not inconsistent with the views expressed in this opinion.

Reversed and remanded.

HUTCHESON, Circuit Judge (dissenting).

From the conclusion of the majority reaffirming the holding of Kennedy v. Mason, 5 Cir., 164 F.2d 1016, that there can be no commerce in war supplies and equipment for the use of the armed forces and that, therefore, the employer and his employees were not engaged in commerce for the production of goods for commerce under the Fair Labor Standards Act, I dissent, as I did in that case.

The holding of the majority, if correct, completely disposes of the case, leaving nothing for judicial determination. If incorrect, the judgment should be affirmed unless for other reasons then become important it should be reversed.

The majority, however, hypothesizing that the employer was engaged in commerce or the production of goods for commerce

---

[6] The term "goods" as defined in Section 3(i) of the Act "does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof". Since the government is here the ultimate consumer, and since the goods were delivered into its actual physical possession as ultimate consumer, any movement of the goods thereafter by the ultimate consumer over state lines would not relate back and take the goods out of the exception of subparagraph (i) of Section 3 of the Act. Harris Kennedy v. Silas Mason Co., 5 Cir., 164 F.2d 1016.

within the act, proceeds upon that hypothesis to determine the status and rights, under the Act, of the various plaintiffs. So proceeding it declares:

"Plaintiffs have wholly failed to discharge their burden of proving that they, as distinguished from their employer, were engaged in commerce or production of goods for commerce, or that a substantial part of their activities were so closely related to commerce as to admit of coverage by the Act."

I think the reversal of the judgment on the authority of Kennedy v. Mason completely deprives these hypothetical conclusions of substance and authority. While, therefore, I am much impressed with the reasons advanced by the majority for some of them, I feel that I should neither concur in, nor dissent from, these conclusions but should withhold my decision on them until the authority and scope of Kennedy v. Mason is determined in the Supreme Court where it now is on grant of certiorari.